1998-NMCA-051

955 P.2d 693

**Crystal KENNEDY, Plaintiff–Appellee,**

v.

**DEXTER CONSOLIDATED SCHOOLS, Donald Warren, Kent Perry, Sue Rodriguez and James Derrick, Defendants–Appellants.**

**Randy FORD, Plaintiff–Appellee,**

v.

**DEXTER CONSOLIDATED SCHOOLS, Donald Warren, Kent Perry and Jim Derrick, Defendants–Appellants.**

No. 17710.

Court of Appeals of New Mexico.

Feb. 3, 1998.

Certiorari Granted April 2, 1998.

Michael L. Stout, Stout & Winterbottom, Roswell, for Appellee Randy Ford.

Tandy Hunt, Randy K. Clark, Tandy Hunt, P.C., Roswell, for Appellee Crystal Kennedy.

Robert D. Castille, Michele Marks, David B. Lawrenz, Simons, Cuddy & Friedman, LLP, Santa Fe, for Appellants.

## OPINION [1]

HARTZ, Chief Judge.

(1) In March 1992 Dexter High School student Monica Fresquez reported to her

teacher, Randy Ragland, that a ring she had left on her desk was missing. The investigation of the ring's disappearance eventually led to the strip search by school personnel of the two Plaintiffs, Crystal Kennedy and Randy Ford, both of whom were students in Ragland's class. They sued Dexter Consolidated Schools (the School District) and six school employees involved in the investigation, claiming violations of their civil rights. After a jury trial the district court entered judgment against five defendants (the Defendants): the School District, School Superintendent James Derrick, Dexter High School Principal Donald Warren, high school counselor Kent Perry, and Sue Rodriguez, the principal's secretary. Kennedy and Ford were each awarded $50,000 in compensatory damages. Kennedy was also awarded punitive damages of $50,000 against Warren and $25,000 each against Perry and Rodriguez; and Ford was awarded $50,000 in punitive damages against Warren and $25,000 against Perry.

(2) On appeal the Defendants claim the following grounds for reversal of the judgments against them: (1) there was insufficient evidence to support liability of the School District or Superintendent Derrick; (2) evidence of school strip searches conducted in 1989 should not have been admitted; (3) the district court failed to instruct the jury on essential elements of the causes of action against the School District and the superintendent; (4) the individual Defendants were entitled to qualified immunity with respect to all claims; (5) the awards of punitive damages were improper; (6) the district court improperly excluded evidence of Plaintiff Ford's drug and alcohol use; (7) the district court permitted prejudicial closing argument; (8) the district court improperly refused to instruct the jury that compensation for constitutional violations must be based on actual damages; (9) Plaintiffs did not make a showing sufficient to support the award of attorney's fees; and (10) the award of prejudgment interest was improper. The School District also contends that it is entitled to Eleventh Amendment immunity, but

---

1. This opinion is substituted for the opinion filed    on December 15, 1997.

it recognizes that this Court is bound by a recent New Mexico Supreme Court opinion adverse to the contention, *Daddow v. Carlsbad Mun. Sch. Dist.*, 120 N.M. 97, 105, 898 P.2d 1235, 1243 (1995). Some of the alleged errors do not require reversal because the claim of error, even if meritorious, was not preserved in the district court or the error was harmless. Other errors, however, require reversal of portions of the judgment. We affirm the judgment against the School District, except that we remand for reconsideration of attorney's fees. We reverse the judgments against the individual Defendants, but we permit retrial with respect to (a) Kennedy's claims for compensatory damages against Superintendent Derrick, Principal Warren, and his secretary, Rodriguez; (b) Kennedy's claim against Warren for punitive damages; and (c) Ford's claims against Warren for compensatory and punitive damages. Perry is entitled to qualified immunity on the claims of both Kennedy and Ford, and Derrick is entitled to qualified immunity with respect to Ford's claims. There was insufficient evidence to support an award of punitive damages against Rodriguez. We deny Plaintiffs' Motion Requesting Certification to the New Mexico Supreme Court.

**BACKGROUND**

(3) Witnesses at trial disputed the precise timing and sequence of events, but most material facts were uncontested. Monica Fresquez was a student in the second-period computer class taught by Randy Ragland. The students in the class were freshmen and sophomores, aged 14 and 15. During class on March 6, 1992 Fresquez removed her rings and placed them on her computer console. She then left her desk to retrieve a graded paper from Ragland. When she returned, she could not find her diamond ring, which she thought had been one of the rings left on the console. After searching briefly for the ring, she reported the loss to Ragland. Ragland, Fresquez, and the other ten students in the class searched the classroom. When the ring was not found, Ragland consulted with Principal Warren, who reviewed the provisions of the school policy manual relating to · searches. The students other than Fresquez were not permitted to leave the room, even after the second period ended. Warren spoke to the students. So did counselor Perry. After asking Ragland to leave the room, Perry told the students that he would turn out the lights, leave the room for a short time, and, if the ring was left on the table during his absence, no questions would be asked. When the ring did not appear, Perry interviewed each student individually in his office. That process also failed to uncover the ring. The students were then taken individually to the school restrooms and strip searched. Principal Warren and the male Athletic Director searched the male students; Sue Rodriguez, the Principal's secretary, and Mary Kuykendall, a teacher, searched the female students. The searches did not produce the ring.

(4) Crystal Kennedy gave the following account of her search: She was the first female searched. When Warren asked the class who wanted to "go first," she thought she was finally receiving permission to go to the restroom. Rodriguez and Kuykendall accompanied her to the restroom. She was told to keep the door on the bathroom stall open while she used the facilities. Rodriguez observed her in the stall. As she stood up, with her pants and underwear down, she was instructed to remove her shoes, socks, pants, and shirt, and to pull her brassiere away from her body and shake it out.

(5) Randy Ford testified that he was escorted to the restroom by Warren and another adult male. He also thought that he was going only to use the facilities. After using the urinal, Ford was asked by the men to remove his clothes. He took off his shoes, socks, shirt, and pants, stripping down to his boxer shorts. He was then asked to pull the shorts away from his waist. Ford and several other students testified at trial that he arrived in class after the ring was reported missing. They said that students protested to Ragland and Perry that Ford should therefore not be searched. Ford further testified that he told Warren in the restroom that he had not been in Ragland's classroom that day before the ring was reported missing.

(6) There was also evidence at trial of a similar incident several years earlier. In

1989, when Derrick was the principal, about 20 students in a class at Dexter Junior High School had been subjected to strip searches when a student reported the loss of a few dollars. After some protests about the searches, the school policy manual was modified to give students the right to request the presence of a parent during a search.

## DISCUSSION

(7) Plaintiffs' judgment was awarded pursuant to the federal Civil Rights Act of 1871, 42 U.S.C. § 1983, which creates a cause of action for damages for persons whose rights under the United States Constitution have been violated by state or local officials. Plaintiffs contend that the Defendants violated constitutional restrictions on searches and seizures.

### I. The Constitutional Standard

■ (8) Ordinarily, law enforcement officers investigating the theft of a ring could not conduct a search of a suspect's person without probable cause. *See New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). But the "custodial and tutelary" nature of the "State's power over school children ... permit[s] a degree of supervision and control that could not be exercised over free adults." *Vernonia School District 47J v. Acton*, 515 U.S. 646, 655, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995) (upholding random urinalysis drug testing of student athletes). "[W]hile children assuredly do not 'shed their constitutional rights ... at the schoolhouse gate,' *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 [89 S.Ct. 733, 736, 21 L.Ed.2d 731] (1969), the nature of those rights is what is appropriate for children in school." *Id.* at 655–56, 115 S.Ct. at 2392.

■ (9) Thus, in *T.L.O.* the United States Supreme Court held that school officials did not need a search warrant, or even probable cause, to search a student's purse for contraband. The Court held that the warrant requirement "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools," 469 U.S. at 340, 105 S.Ct. at 742, and that "strict adherence" to a probable-cause requirement could not be justified in light of "the substantial need of teachers and administrators for freedom to maintain order in the schools." *Id.* at 341, 105 S.Ct. at 742; *see Vernonia Sch. Dist.*, 515 U.S. at 653, 115 S.Ct. at 2390–91. Consequently, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742. To be reasonable, a school search must satisfy a two-step test. First, the search must be "justified at its inception," *id.*, by "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school," *id.* at 342, 105 S.Ct. at 743. (This first test is not unlike the standard for school searches previously adopted by this Court: "a reasonable suspicion that a crime is being or has been committed or ... reasonable cause to believe that the search is necessary in the aid of maintaining school discipline." *Doe v. State*, 88 N.M. 347, 352, 540 P.2d 827, 832 (Ct.App.1975).) Second, the search must be "reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342, 105 S.Ct. at 743.

(10) *T.L.O.*, however, left much of the law regarding school searches for development by lower courts or later Supreme Court decisions. Of special interest to this appeal are two matters unresolved by *T.L.O.* First, although individualized suspicion supported the search at issue in *T.L.O.*, *see Vernonia Sch. Dist.*, 515 U.S. at 653, 115 S.Ct. at 2390–91, the Supreme Court specifically declined to decide whether individualized suspicion is always required for a student search, *T.L.O.*, 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. Also left open by the opinion is the meaning of "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. at 743. In particular, *T.L.O.* does not resolve the issue we must decide on this appeal: Is individualized reasonable suspicion necessary before school officials may conduct a search that requires a student to strip down to undergarments?

(11) Nevertheless, we are not without guidance in resolving this issue. We conclude that the searches here required at least individualized reasonable suspicion and that therefore the searches violated Plaintiffs' constitutional rights.

(12) Our conclusion does not rest on any case that is directly in point. There are surprisingly few post–*T.L.O.* reported decisions regarding strip searches. *See generally* Alexander C. Black, *Search Conducted by School Official or Teacher as Violation of Fourth Amendment or Equivalent State Constitutional Provision,* 31 A.L.R.5th 229 § 70 (1995) (collecting strip search cases). The few opinions that have been handed down do not address whether individualized suspicion is necessary. The searches that have been upheld were based on individualized reasonable suspicion, so the court did not need to resolve whether the search could have been upheld under a less demanding standard. *See Cornfield ex rel. Lewis v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316 (7th Cir.1993); *Widener v. Frye,* 809 F.Supp. 35 (S.D.Ohio 1992), *aff'd without opinion,* 12 F.3d 215 (6th Cir.1993); *Singleton v. Board of Educ.,* 894 F.Supp. 386, 390–91 (D.Kan.1995); *cf. Jenkins v. Talladega City Bd. of Educ.,* 115 F.3d 821 (11th Cir.) (en banc), *cert. denied* —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997) (individual defendants entitled to qualified immunity); *Williams ex rel. Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991) (same). On the other hand, the decisions finding strip searches to be unconstitutional do not appear to rely on the absence of individualized suspicion. In one the court said that the second prong of the *T.L.O.* test was not satisfied, *Coronado v. State,* 835 S.W.2d 636, 641 (Tex.Crim.App. 1992) (en banc) (search was not reasonably related to the evidence indicating that the student was skipping school). Two others apparently found the searches improper because what was being searched for was not of sufficient importance to justify a strip search, *Oliver ex rel. Hines v. McClung,* 919 F.Supp. 1206, 1217–18 (N.D.Ind.1995) ($4.50 missing); *State ex rel. Galford v. Mark Anthony B.,* 189 W.Va. 538, 433 S.E.2d 41, 48–49 (1993) ($100 missing; individualized suspicion present, but strip search can be justified only by

exigent circumstances relating to safety), an issue we need not decide on this appeal. In a fourth case there was not reasonable suspicion, so there was no need to address whether suspicion must be individualized. *Cales v. Howell Pub. Sch.,* 635 F.Supp. 454 (E.D.Mich.1985).

(13) Thus, we look to more general principles. *T.L.O.* itself is quite suggestive. In the same footnote that reserved the question whether individualized suspicion is always necessary, the Court went on to explain:

> Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'"

469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8 (quoting *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979)). Relying in part on this language, at least three courts have held that individualized suspicion is ordinarily necessary for a search by school authorities. *DesRoches v. Caprio,* 974 F.Supp. 542 (E.D.Va. 1997) (backpack search for missing shoes); *Burnham v. West,* 681 F.Supp. 1160, 1163–64 (E.D.Va.1987) (search of pockets, purses, and bags); *In re Doe,* 77 Hawai'i 435, 887 P.2d 645, 654–55 (1994) (search of purse); *but cf. DesRoches,* 974 F.Supp. at 549 (may not need individualized suspicion to search for weapons or drugs); *Burnham,* 681 F.Supp. at 1167 n. 8 (individualized suspicion may not always be necessary, as when handgun brandished amidst crowd of students); *In re Gregory M.,* 82 N.Y.2d 588, 606 N.Y.S.2d 579, 581–82, 627 N.E.2d 500, 502–03 (1993) (may not need individualized suspicion for less intrusive searches). The above-quoted footnote in *T.L.O.* is a strong signal that a search as intrusive as a strip search should be founded on individualized suspicion. *But cf. Bell v. Wolfish,* 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979) (upholding requirement that all pretrial detainees in jail be subjected to strip search after contact visit); *Vernonia Sch. Dist.,* (upholding ran-

dom urinalysis drug testing of student athletes).

(14) We are buttressed in this view by the special treatment of strip searches in other contexts. Case law regarding border searches is particularly instructive in this regard.

(15) The First Congress—the same Congress that proposed the Bill of Rights—exempted border searches from a probable-cause requirement. *See* 4 Wayne R. LaFave, *Search and Seizure A Treatise on the Fourth Amendment* § 10.5(a), at 530 (3d ed.1996). Our nation's courts have consistently held that routine border searches can be conducted routinely, without any showing of reasonableness other than that the search was a border search. *See United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977). Yet, despite the broad power to conduct suspicionless border searches, the courts have drawn the line at strip searches. The federal courts of appeals have required individualized reasonable suspicion to justify a strip search because it is "such an extensive invasion of privacy," *United States v. Asbury,* 586 F.2d 973, 975 (2d Cir.1978), because it is a "significantly greater ... intrusion," *United States v. Himmelwright,* 551 F.2d 991, 994 (5th Cir.1977), or because of the "indignity" of a strip search, *United States v. Guadalupe–Garza,* 421 F.2d 876, 878 (9th Cir.1970); *see also United States v. Montoya de Hernandez,* 473 U.S. 531, 541 n. 4, 105 S.Ct. 3304, 3310 n. 4, 87 L.Ed.2d 381 (1985) (prolonged detention of suspected alimentary canal smuggler justified by reasonable suspicion; specifically not deciding what level of suspicion, if any, is necessary for non-routine searches, such as strip searches, at the border); *see generally United States v. Shepard,* 930 F.Supp. 1189, 1193–95 (S.D.Ohio 1996) (summarizing law regarding strip searches at border).

■ (16) To be sure, there is a difference between requiring someone to strip naked and requiring someone to strip down to one's underwear. The former intrusion is significantly greater. But requiring an adolescent student to strip down to underwear is sufficiently "destructive of privacy and offensive

to personal dignity," *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 680, 109 S.Ct. 1384, 1398, 103 L.Ed.2d 685 (1989) (Scalia, J., dissenting) (characterizing circumstances surrounding compelled giving of urine samples), to require individualized suspicion. In drawing the line between routine border searches not requiring specific justification and non-routine searches that do, the en banc Fifth Circuit Court of Appeals stated that a routine search includes a "pat-down or frisk, [and] the requirement that outer garments such as coat or jacket, hat or shoes be removed, [and] that pockets, wallet or purse be emptied." *United States v. Sandler,* 644 F.2d 1163, 1169 (5th Cir.1981) (en banc); *see* 4 LaFave, *supra,* § 10.5(a), at 531–34. As we understand *Sandler,* requiring someone to strip down to undergarments would be "non-routine." Similarly, the Ninth Circuit Court of Appeals, in holding that requiring someone to remove her boots did not bring into play the strip-search standard, stated that the test was whether "the suspect is forced to disrobe to a state which would be offensive to the average person." *United States v. Chase,* 503 F.2d 571, 574 (9th Cir. 1974). *See generally* 4 LaFave, *supra,* § 10.5(c) (strip searches at the border), § 10.5(d) (intermediate searches at the border). Whereas *Chase* speaks of disrobing that would be "offensive to the average person," the test in the case before us would be what is offensive to the average student of the age and sex in question. *See T.L.O.,* 469 U.S. at 342, 105 S.Ct. at 743 (search should not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction"). Given the typical adolescent's self-consciousness about his or her body, we believe that requiring such a student to strip down to undergarments is sufficiently offensive to require the protection of at least individualized reasonable suspicion.

(17) In reaching this conclusion, we are not stating that the government always needs individualized reasonable suspicion before requiring someone to strip down to undergarments, or even strip naked. Special circumstances surround arrestees and convicts who are incarcerated. *See Bell,* 441 U.S. at 558–60, 99 S.Ct. at 1884–85 (uphold-

ing requirement that all inmates be subjected to strip search after contact visit); *Illinois v. Lafayette,* 462 U.S. 640, 646 n. 2, 103 S.Ct. 2605, 2609 n. 2, 77 L.Ed.2d 65 (1983) (upholding inventory search of arrestee's bag; expressly not considering when strip search of arrestee may or may not be appropriate); *cf. Romo v. Champion,* 46 F.3d 1013, 1020 (10th Cir.1995) (strip search of prison visitors permitted on reasonable suspicion; 4 LaFave, *supra,* § 10.7 (area-entry searches). We also do not address the standard imposed on school searches when there is a grave, imminent danger to health or safety. What we are deciding here is the standard governing strip searches of students for evidence, missing property, or contraband (other than items posing a grave, imminent danger).

(18) The remaining issue regarding the constitutionality of the search in this case is whether there was individualized reasonable suspicion. There was not. Although it was reasonable for school officials to believe that one of the ten other students in the classroom had taken Monica Fresquez's ring, that group is too large for each of its members to be considered individually suspect. We acknowledge the uncertainty regarding where precisely to draw the line between individualized and group-focused suspicion. *See Des-Roches,* 974 F.Supp. at 549–50. Moreover, how "individualized" the suspicion must be may depend on the nature of the search. *See Cornfield,* 991 F.2d at 1321 ("[A]s the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness."); *Cason v. Cook,* 810 F.2d 188 (8th Cir.1987) (four students seen in locker room at time of thefts from locker; none had permission to be there at the time; court upholds search of purse of one of the four); *cf. United States v. Mastberg,* 503 F.2d 465 (9th Cir.1974) (suspicion focused on female passenger when strip search of the two male passengers revealed nothing). But this is not a close case. The strip searches of the two Plaintiffs could not be justified simply on the ground of their being among ten people present at the scene of an apparent crime, with nothing to make them more suspect than any of the other non-victims present. We note that the De-

fendants have not contended that individualized suspicion was present.

## II. Liability of the School District

### A. Sufficiency of the Evidence

■ (19) Having determined that the searches were unconstitutional, we now turn to the question of the Defendants' liability. The question is not a simple one to answer. Liability does not necessarily follow from illegality. We begin with the liability of the School District.

■ (20) Section 1983 does not impose liability on a government agency for the acts of its employees under the theory of respondeat superior. *Gallegos v. State,* 107 N.M. 349, 353, 758 P.2d 299, 303 (Ct.App.1987). To hold the School District liable, it is necessary to establish more than just that School District personnel conducted an unconstitutional search. The unconstitutional search must have been caused by a School District policy or custom. *Board 'of County Comm'rs v. Brown,* 520 U.S. 397, ——, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

(21) The School District contends that its only involvement with the search was the issuance of a policy manual, and the manual recites the law correctly. We agree that the manual in itself does not expose the district to liability. The manual provision on searches states: "[A]n authorized person may conduct a search when he has a reasonable suspicion that a crime or other breach of disciplinary rules is occurring or have [sic] occurred." Plaintiffs do not claim that the policy misstates the law.

■ (22) Nevertheless, a policy valid on its face is not always enough for a local governmental body to escape liability. The policy, in the absence of proper training of those who must implement it, may send the wrong signal. Liability under § 1983 can arise from an inadequate (or nonexistent) training program. When the absence of an adequate training program with respect to a facially lawful policy leads to the violation of a person's rights, the local government is liable if its failure to provide the proper training manifests deliberate indifference to the known or obvious consequences of that

failure. *See id.* at ——, 117 S.Ct. at 1390. "Continued adherence [by municipal decision makers] to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* at ——, 117 S.Ct. at 1390 (quoting *Canton v. Harris,* 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 1205 n. 10, 103 L.Ed.2d 412 (1989)). Proof of repeated violations by employees is not an absolute requirement for liability; indeed, liability could flow from "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation[.]" *Id.* at ——, 117 S.Ct. at 1391.

(23) Given the above legal principles, the jury could properly find the School District liable for not training its personnel regarding restrictions on strip searches. Evidence at trial indicated that the 1989 strip searches of students at Dexter Junior High School was highly publicized. One can conclude that the school board knew that students had been strip searched without individualized reasonable suspicion. In addition, Derrick, the school superintendent from 1990 through 1992, had been the principal in 1989 who directed the searches. Yet, when the school board reviewed its policy regarding searches, *the only change to the policy manual was to require notification of a parent upon a student's request.* Nothing specific was added concerning strip searches. The natural, even compelling, inference is that the school board endorsed strip searches conducted without individualized reasonable suspicion. The obvious consequence of continuing the school policy regarding searches—at least, in the absence of specific training of school employees regarding strip searches—would be future unconstitutional searches. The evidence would support a finding that the school district's policymakers displayed "deliberate indifference" to the conduct of strip searches by school employees. Although we are confident that school policymakers did not believe such searches to be unconstitutional, good faith ignorance of the law is not a defense to

a § 1983 claim against the School District. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).

### B. Admissibility of Evidence of 1989 Searches

(24) The above discussion demonstrates the relevance and admissibility of testimony concerning the 1989 strip searches. Such evidence was necessary to establish knowledge of school district policymakers that the policy manual would be interpreted to allow strip searches without individualized suspicion.

### C. Failure to Instruct Jury Properly

(25) Remarkably, no jury instruction set forth the elements that needed to be proved to establish the cause of action against the School District. The jury instructions did not distinguish the liability of the School District from the liability of the individual Defendants. Question 2 of the special verdict form asks the jury, out of the blue, to answer whether the violations of each Plaintiff's rights were "done pursuant to the ... School District search and seizure policy or a ... School District custom regarding searches of students?" But *nothing* in the instructions refers to the need to establish "deliberate indifference."

(26) Nevertheless, the School District's claim of error in the instructions was not preserved below. Defendants did not object to either the instruction stating the elements of the cause of action or the special interrogatory. The School District contends that it preserved its claim in its requested instructions. One paragraph of its eight-paragraph theory-of-the-case instruction states:

To establish a claim against defendants sued in their official capacity (an "official capacity defendant" is merely another way of saying the suit is against the school board), [Plaintiffs have] the burden of proving that the school board had learned of facts pointing to abuse of students' Fourth Amendment rights and demonstrated deliberate indifference towards

these rights by failing to take action that was obviously necessary to prevent the abuse. Negligence is not enough. There must be a policy of deliberate indifference.

But to preserve error with respect to failure to instruct on a point of law, "a correct instruction must be tendered." Rule 1–051(I), NMRA 1997. The district court may reject a tendered instruction if it is legally or factually insufficient. *See Mireles v. Broderick,* 117 N.M. 445, 452, 872 P.2d 863, 870 (1994). Here, the tendered instruction was properly rejected as misstating the law. Inasmuch as the individual Defendants were not sued in their official capacities, the instruction was confusing and misleading. We also note our confusion as to the meaning of "a *policy* of deliberate indifference." Finally, the tendered instruction appears inconsistent with the theory of the uniform jury instructions in that it contains both positive and negative statements of the same proposition. *See State v. Ruiz,* 119 N.M. 515, 521, 892 P.2d 962, 968 (Ct.App.1995).

(27) Notwithstanding these deficiencies, we might well have found the issue preserved if the record showed that counsel had specifically directed the district court's attention to the need to instruct the jury on "deliberate indifference" with respect to the School District's liability. *See Gallegos v. State,* 113 N.M. 339, 341, 825 P.2d 1249, 1251 (1992). The record, however, contains no such remark. Given that the district court included question two on the special verdict form, *requiring the jury to find that the violations* of Plaintiffs' rights were pursuant to a School District custom or policy, the court may well have included the missing element had counsel alerted it to that particular issue. In our view, the important purposes of the preservation requirement—(1) to alert the district court to the error so that it may be corrected and (2) to give the opposing party a fair opportunity to respond—were not met. *See State v. Gomez,* 1997 NMSC 006, ¶ 29, 122 N.M. 777, 932 P.2d 1.

### III. Supervisory Liability of Superintendent

■ (28) Superintendent Derrick contends that there was insufficient evidence to impose liability upon him in his supervisory capacity and that the jury was not properly instructed with regard to such liability. We reject both contentions.

■ (29) In *Gallegos v. State,* 107 N.M. 349, 758 P.2d 299 (Ct.App.1987), we reviewed the law regarding liability of supervisors under § 1983. We stated that a supervisor may be liable if the supervisor "has notice of the pervasive risk of harm, but fails to implement a policy that promotes correction of the harm or deters future [mis]conduct." 107 N.M. at 353, 758 P.2d at 303. Also, supervisory defendants may be liable "if [they] were in a position of authority over the persons directly involved in the incident, knew of prior actions by those persons that denied the constitutional rights of others, and failed to take action to prevent future violations of the rights of others." *Id.* at 354, 758 P.2d at 304.

■ (30) The thrust, if not the precise language, of *Gallegos* is that a supervisor may be liable under § 1983 for failure to train subordinates to refrain from specific unconstitutional action if the supervisor has reason to know that such action is likely to occur in the absence of such training. *See Wilks v. Young,* 897 F.2d 896, 898 (7th Cir. 1990). Under that standard, Derrick could be subject to liability. (The issue of qualified immunity will be addressed later.) He knew of the 1989 strip search of an entire class without individualized suspicion and of the failure to change the school policy manual to preclude such searches. The likelihood of a repeat performance was high. Yet, as a supervisor he did not take steps to instruct school personnel that such searches are impermissible.

(31) As for Derrick's contention regarding inadequate jury instructions, we agree that the jury should have been instructed on the requisites for holding him liable. But he has failed to show how he preserved this contention in district court. *See* Rule 1–051(I) (preservation of error with respect to instructions). Therefore, we will not reverse the judgment on this ground.

## IV. Qualified Immunity

■ (32) Employees of state or local governments whose acts violate another person's constitutional rights are not necessarily liable to the other person under § 1983. They are entitled to a "qualified immunity," which relieves them of liability if "their conduct [did] not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Romero v. Sanchez,* 119 N.M. 690, 692, 695, 895 P.2d 212, 214, 217 (1995); *see also United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (applying same standard in criminal prosecution under 18 U.S.C. § 242). Qualified immunity recognizes " 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' " *Harlow,* 457 U.S. at 807, 102 S.Ct. at 2732 (quoting *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978)). It protects against "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' " *Id.* at 814, 102 S.Ct. at 2736 (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949)).

■ (33) Given the rationale for qualified immunity, it might seem appropriate simply to immunize public officials who act with a good faith belief that their conduct is proper. But the United States Supreme Court has rejected a subjective test because of the burden it could place on the persons to be protected by qualified immunity. If the public official's state of mind is the central issue, there is likely to be protracted discovery regarding the official's motives, and, given the difficulty of definitively establishing a person's state of mind, there would be little chance of obtaining summary judgment in favor of the official. Consequently, the Supreme Court adopted an objective test. *See Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738; *Anderson v. Creighton,* 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 3039 n. 2, 97 L.Ed.2d 523 (1987). The official is immune from liability unless the official's action violated "law [that] was clearly established at the time [the] action occurred." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

(34) The Supreme Court has explained the meaning of "clearly established" as follows:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citation omitted). This test protects officials "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 638, 107 S.Ct. at 3038. Yet, it "provide[s] no license to lawless conduct." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738–39.

(35) The question before us, then, is what law pertinent to the search of Plaintiffs was "clearly established" at the time of the search. We look first to *T.L.O.* As previously mentioned, a footnote in the opinion specifically defers decision on whether individualized suspicion is required for school officials to conduct a search of a student. 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. Although *T.L.O.* states that the reasonableness of the search will depend on how intrusive it is, *id.* at 342, 105 S.Ct. at 743, and the footnote itself states that individualized suspicion is generally required when the intrusion on privacy is more than minimal, *id.* at n. 8, the opinion does not specifically address searches in which students are required to remove clothing. Justice Stevens wrote an opinion expressing strong disapproval of strip searches under any circumstances, *id.* at 382 n. 25, 105 S.Ct. at 764 n. 25, but only one other justice joined in that portion of his opinion. We cannot say that *T.L.O.* "clearly established" the illegality of the search of Plaintiffs.

(36) Also, the case law directly in point is quite limited. We have found only one reported decision interpreting *T.L.O.* prior to the March 1992 search of Plaintiffs in which

the court ruled a strip search of a student to be unconstitutional. (Although cases predating *T.L.O., see, e.g., Bellnier v. Lund,* 438 F.Supp. 47 (N.D.N.Y.1977), may have been decided correctly, they could not "clearly establish" the post–*T.L.O.* law because one could not be sure that the court would analyze the law the same way once the Supreme Court had spoken on the matter.) In *Cales v. Howell Public Schools,* 635 F.Supp. 454, 455 (E.D.Mich.1985), a 15–year–old student removed her jeans and was required to bend over so that the contents of her brassiere could be inspected. The court held that the search was not excessively intrusive as a search for drugs, *id.* at 458, but that her conduct—ducking behind a car in the school parking lot when she should have been in school and then giving a false name to the security guard—did not create a reasonable suspicion that she carried evidence of drug usage, *id.* at 457. The opinion, however, does not address *individualized* suspicion.

(37) Perhaps *Burnham v. West,* 681 F.Supp. 1160 (E.D.Va.1987), is more in point because it states that individualized suspicion is ordinarily required to search a student's purse or bag. *A fortiori,* individualized suspicion would be necessary for a strip search. Nevertheless, one federal district court decision does not "clearly establish" the law. To determine whether law is "clearly established," we ordinarily look to decisions of the United States Supreme Court, federal courts of appeal, and the highest courts of the states. *See Yount v. Millington,* 117 N.M. 95, 101, 869 P.2d 283, 289 (Ct.App.1993); *cf. Lanier,* 520 U.S. at –– – ––, 117 S.Ct. at 1226–27 (using similar standard in prosecution under 18 U.S.C. § 242). We therefore turn to those sources.

(38) We have found no pre–1992 state supreme court decisions that are helpful on this point. As for pre–1992 federal appeals court decisions, the only post–*T.L.O.* reported opinion addressing strip searches upheld the search, but it was based on individualized suspicion. *Williams ex rel. Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991).

(39) Despite this dearth of precedent, we hold that the law was clearly established by March 1992 that a nude search of a student by school officials requires at least reasonable suspicion directed at the particular student, at least in the absence of grave, imminent danger to health or safety. We are persuaded by a pre–*T.L.O.* decision by the Seventh Circuit Court of Appeals. In *Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980), the Court wrote, "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude." We recognize the limitations of this authority. The full import of the proposition stated is not totally clear because the school district in *Renfrow* had conceded the absence of reasonable suspicion for the search; the court did not discuss when, if ever, a nude search would be appropriate. *But see Cornfield ex rel. Lewis v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316 (7th Cir.1993) (upholding nude search based on individualized reasonable suspicion). Moreover, the impact of the language in *Renfrow* is diminished somewhat by the fact that the Supreme Court majority in *T.L.O.* sidestepped the issue even though the above-quoted passage was quoted in Justice Stevens' opinion and by the New Jersey Supreme Court in the opinion reversed by *T.L.O. See T.L.O.,* 469 U.S. at 382 n. 25, 105 S.Ct. at 764 n. 25 (Stevens, J., concurring in part and dissenting in part); *State in re T.L.O.,* 94 N.J. 331, 463 A.2d 934, 941 (1983).

(40) What gives the passage from *Renfrow* continuing power, however, is its reaffirmation after *T.L.O.* We find it highly significant that the federal court of appeals for the circuit which encompasses New Mexico twice quoted *Renfrow* with approval after the Supreme Court decision in *T.L.O.* and before the search in this case. *Walters v. Western State Hosp.,* 864 F.2d 695, 699–700 (10th Cir.1988); *Garcia ex rel. Garcia v. Miera,* 817 F.2d 650, 658 (10th Cir.1987). *Garcia* is particularly in point because it involved school officials. It quoted *Renfrow* as above in rejecting a claim of qualified immunity for excessive force in imposing discipline. Although the question is a close one, we believe that this constitutes sufficient authority—particularly in light of the common sense of the proposition—that at least individualized

reasonable suspicion is required before school officials can conduct a nude search for a missing ring.

■ (41) On the other hand, we are unwilling to hold that in March 1992 the law was clearly established that individualized reasonable suspicion is always necessary before school officials can conduct a search in which students are required to strip down to their undergarments. We note that the suspicion in this case, although not individualized, was limited to a small group, and the searches were conducted in restrooms in which the school officials conducting the search were of the same sex as the student being searched. Thus, the individual Defendants had qualified immunity to the extent that the searches of Plaintiffs (1) did not require them to be inspected after removing undergarments and (2) were based on reasonable, albeit non-individualized, suspicion. Although we have already held in this opinion that strip searches without individualized reasonable suspicion are unconstitutional, we reiterate that the standard for determining qualified immunity is whether the unconstitutionality of the search was "clearly established" at the time of the search.

■ (42) Based on the above analysis, three of the individual Defendants have no qualified immunity with respect to the search of Crystal Kennedy. There was evidence that while using the toilet she was required to leave the stall door open so that she could be observed by Rodriguez and that she was then required to stand, with her pants and underwear down, while still under observation. Because this was a nude search, Warren, who ordered the search, was not entitled to qualified immunity, nor was Derrick, who failed to provide for training of school employees to prevent a repeat of the strip searches conducted in 1989 without individualized reasonable suspicion.

■ (43) As for Rodriguez, Warren's secretary, who actually conducted the search, we have strong reservations. From the perspective of public policy, we question the advisability of holding a public employee liable for obeying instructions from a superior unless the employee knows or should know that the conduct is improper or the employee acts with reckless disregard of whether the conduct is proper. There is some support for this view in the following passage from *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738:

> If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

Rodriguez has not, however, pressed this theory, so we do not apply it here to give her qualified immunity. *See Oliver*, 919 F.Supp. at 1219 (no qualified immunity for food worker called on to assist in nude search of student).

■ (44) The liability of counselor Perry requires special consideration. He did not participate in the searches of either Kennedy or Ford. Nor did he order that the searches be conducted; he had no authority to order the searches. Plaintiffs' theory was that Perry was part of a good guy/bad guy tag-team act. His role was to encourage the culprit to confess so that the entire class would not be subjected to strip searches. That view of the evidence, however, is not sufficient to impose liability on Perry. There was no evidence at trial that Perry suggested to Principal Warren that strip searches be conducted or that he advocated the searches in any other way. His unchallenged testimony was that he requested an opportunity to talk to the students so that personal searches would be unnecessary. We are aware of no reported decisions today, much less by 1992, indicating that engaging in such conduct would violate the students' constitutional rights. *Cf. Johnson v. Weast*, 1997 NMCA 066, 123 N.M. 470, 943 P.2d 117 (drug inspector who submitted investigative report cannot be liable under § 1983 for wrongfully causing Plaintiff's arrest).

(45) Our analysis with respect to the search of Randy Ford is different. Because

he was not required to expose his private parts to view, we do not characterize his search as a nude search. There would therefore be qualified immunity for the search if based on reasonable, even though not individualized, suspicion. On the other hand, there was evidence at trial that Ford was not present in the classroom prior to the announcement that the ring was missing. To conduct a strip search of Ford when he could not have been involved in the theft of the ring would be clearly unconstitutional, and the unconstitutionality would have been clearly evident in 1992. Thus, we must examine the immunity of Derrick and Warren in light of their specific knowledge regarding Ford.

(46) Superintendent Derrick enjoys qualified immunity. He was out of town at the time of the search and had no direct involvement in it. As for his duty to provide for proper training of school personnel, he had no duty to supplement the school policy manual by training school personnel not to search patently innocent students. After all, the school policy permitted searches only upon "reasonable suspicion."

(47) The result is otherwise with respect to Principal Warren. Ford testified that before the search he told Warren that he had not been present in the classroom "when all this happened." Warren, of course, was not required to believe Ford. But he could not reject Ford's assertion without any reason to do so. If the jury found, as it could have, that Warren lacked a substantial basis for believing that Ford had been in the classroom before the announcement that the ring was missing, Warren would not be entitled to qualified immunity. Cf. 2 Wayne R. LaFave, A Treatise on the Fourth Amendment § 3.2(e), at 47–49 (3d ed. 1996) (discussing whether an officer can have probable cause without checking out exculpatory information).

(48) Finally, we note an error that requires retrial of the claims against the individual Defendants. The instruction with respect to the contentions of each Plaintiff stated:

> To establish the claim of violation of Constitutional Rights by the Defendants,

[Plaintiff] has the burden of proving at least one of the following contentions:

1. [Plaintiff] was unreasonably subjected to a search of [her/his] person; and/or

2. [Plaintiff] was unreasonably detained and not permitted to go to [his/her] classes or to use the restroom facilities[.]

The brief in chief contends that the individual Defendants were entitled to qualified immunity with respect to the claim that the Plaintiffs were "unreasonably detained and not permitted to go to [their] classes or to use the restroom facilities." If so, the jury should not have been instructed on that claim. And if one of the theories of recovery should not have gone to the jury because of its legal inadequacy, the jury verdict must be set aside. See Gerety v. Demers, 86 N.M. 141, 143, 520 P.2d 869, 871 (1974); Salinas v. John Deere Co., 103 N.M. 336, 341, 707 P.2d 27, 32 (Ct.App.1984); cf. State v. Olguin, 120 N.M. 740, 740–41, 906 P.2d 731, 731–32 (1995) (guilty verdict should be set aside if jury instructed on legally inadequate alternative basis for conviction).

(49) Remarkably, the answer briefs do not respond to this contention by Defendants. In any event, we agree with the contention. We are aware of no clearly established law, particularly by March 1992, that the detention of the students violated their constitutional rights. Cf. Boyett ex rel. Boyett v. Tomberlin, 678 So.2d 124, 127 (Ala.Civ.App. 1995) (plaintiff suspended from school for leaving class to go to bathroom without permission), cert. denied, —— U.S. ——, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997). We therefore set aside the verdicts against the individual Defendants and remand for a new trial of Defendants Derrick, Warren, and Rodriguez with respect to the search of Kennedy and a new trial of Warren with respect to the search of Ford.

## V. Punitive Damages

(50) The jury awarded punitive damages against Warren, Perry, and Rodriguez. They claim that there was insufficient evidence to support those awards. We have already held that Perry was entitled to quali-

fied immunity, thus disposing of the punitive award against him as well. We therefore address only the awards against Warren and Rodriguez.

■ (51) Because Plaintiffs seek recovery under a federal statute, federal law governs the standard for awarding punitive damages. *Nelson v. Emerald People's Util. Dist.,* 318 Or. 99, 862 P.2d 1293, 1299–1300 (1993) (§ 1983 claim); *see Johnson v. Lally,* 118 N.M. 795, 798, 887 P.2d 1262, 1265 (Ct. App.1994) (§ 1983 action brought in state court is subject to federal remedies). The jury was properly instructed that it could award punitive damages for conduct that was "malicious, willful, reckless, or wanton." *See Smith v. Wade,* 461 U.S. 30, 51, 56, 103 S.Ct. 1625, 1637, 1640, 75 L.Ed.2d 632 (1983) (punitive damages can be awarded in § 1983 actions for "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law").

(52) What does this standard mean in the context of a § 1983 action? A defendant ordinarily is subject to liability for compensatory damages under § 1983 for intentional conduct that violates "clearly established" law, even if the defendant had no knowledge of the law. *See Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738. But the general rule regarding punitive damages is that they require an " 'evil motive,' " or " 'culpable mental state.' " *Paiz v. State Farm Fire & Cas. Co.,* 118 N.M. 203, 211, 880 P.2d 300, 308 (1994). Judge Posner analyzed the matter as follows:

> The words used to mark off the domain of punitive damages—words like "maliciously," "wantonly," "oppressively," "spitefully"—indicate that punitive damages ... are reserved for cases where the wrongfulness of the defendant's conduct is conspicuous, implying that its wrongfulness is apparent to the person who engages in it, and not just to a lawyer.... We may therefore set it down as a condition of awarding punitive damages that the defendant almost certainly knew that what he was doing was wrong and subject to punishment.

*Soderbeck v. Burnett County, Wis.,* 752 F.2d 285, 291 (7th Cir.1985). Now–Justice Breyer quoted the above passage with approval in writing for the First Circuit Court of Appeals, *Hernandez–Tirado v. Artau,* 874 F.2d 866, 870 (1st Cir.1989). *See Jolivet v. Deland,* 966 F.2d 573, 577 (10th Cir.1992) (affirming denial of punitive damages in § 1983 case; not shown that defendant "either acted with malice or knew his actions were unconstitutional"); *Lavicky v. Burnett,* 758 F.2d 468, 477 (10th Cir.1985) (simple ignorance of applicable legal rules, even arrogant ignorance, is insufficient by itself for punitive damages under § 1983).

■ (53) Judged by this standard, the punitive damage award against Rodriguez cannot stand. The decision to strip search Kennedy was not hers. She was directed to do so by her principal. There is no evidence that she knew that the search was unlawful, much less unconstitutional. Much was made at trial of her participation in the 1989 search, but her experience in that regard would not have taught her the proper constitutional lesson. On the contrary, although members of the community had expressed strong objections to the 1989 searches, the only revision made to school policy was to permit a suspected student to request the presence of a parent. There was no evidence at trial that Rodriguez had been informed in any authoritative manner that strip searches were unconstitutional in the absence of individualized suspicion. We cannot affirm an award of punitive damages against a school employee who was not responsible for discipline (and therefore had no duty to be acquainted with applicable law) and who was obeying the directive of a principal to perform a search that she did not know to be unlawful.

■ (54) The analysis with respect to Principal Warren is somewhat different. As with Rodriguez, there was no evidence that Warren knew that the search of Kennedy would be unlawful. The above-quoted passage from *Soderbeck* would therefore appear to relieve him of liability for punitive damages. Nevertheless, we believe that the *Soderbeck* formulation does not exhaust the circumstances in which punitive damages are appropriate under § 1983. The Supreme Court in *Smith v. Wade* quoted with approval

the provision of the Restatement (Second) of Torts § 908(2) (1979) that permits an award of punitive damages " 'because of the defendant's evil motive *or his reckless indifference to the rights of others.*' " 461 U.S. at 46–47, 103 S.Ct. at 1635–36. We conclude that the requisite mental state is present when the person who violated another's constitutional rights acted with improper motive and reckless indifference to whether the conduct violated the constitutional rights of the victim. The jury could have found that to be the case with respect to Warren. The students in the class had been warned that if the culprit did not turn over the ring, the students would be strip searched. From evidence admitted at trial, Plaintiffs' counsel built an argument that Warren ordered the searches in order to save face, so that the students would not believe that school officials make empty threats. The evidence could support a jury determination that Warren ordered the search simply to establish his authority, with no concern whether the search violated the students' constitutional rights.

■ (55) We also find sufficient evidence to support the award to Ford of punitive damages against Warren. Ford testified that prior to the search he told Warren that he "wasn't even in class when all this happened." The jury could find the requisite culpable mental state if it inferred that Warren pursued the search without any concern whether Ford had told the truth. Consequently, punitive damages against Warren may be sought on retrial.

(56) Defendants also contend that the awards of punitive damages were improper because there was no evidence regarding the wealth of the individual Defendants who were found liable for such damages. We do not address this claim of error, however, because they have not shown how they preserved it in district court.

## VI. Evidence of Ford's Alcohol and Substance Abuse

■ (57) Prior to trial the district court granted Ford's motion in limine to exclude evidence concerning his alleged drug and alcohol use, so long as Ford did not open the door to such inquiry. The issue arose at trial several times. First, after Ford testified that the search caused him to drop out of school, defense counsel sought to introduce evidence that Ford's substance abuse was the actual reason. At the suggestion of the court, the parties stipulated that (1) Ford would abandon his claim that he dropped out of school because of the search and (2) defense counsel would not pursue the proposed line of questioning. The matter next arose after Ford's psychiatric expert testified to psychological damage resulting from the search. The expert testified that Ford had been floundering in school before the search but that the search "was kind of like throwing a drowning person a rock." Defense counsel repeated his contention that he should be permitted to put on evidence of Ford's substance abuse. The district court denied the request. Finally, defense counsel unsuccessfully attempted to introduce evidence of Ford's "alcoholism" through the testimony of Defendant Rodriguez.

(58) We agree with Defendants that evidence of Ford's substance abuse could have been relevant. Ford sought damages for emotional harm resulting from the search. Substance abuse may have been a cause, or even *the* cause, of his emotional problems. The admissibility of such evidence, however, turns on the particulars of the case. On one hand, the evidence may have more or less probative value depending upon the evidence regarding Ford's pre-search mental state and the nature, extent, timing, and consequences of his substance abuse. On the other hand, evidence of substance abuse has the potential to inflame the jury. The question for the trial judge is whether the danger of such unfair prejudice substantially outweighs the probative value of the evidence. *See* Rule 11–403, NMRA 1997. On the record before it the district court could properly exclude the evidence. Defendants' proffer did not include the necessary specifics regarding Ford's drug use. Essentially, it stated only that in the past he had used "a variety of drugs, including acid." We will not reverse on this ground.

## VII. Kennedy's Closing Argument

■ (59) On appeal Defendants raise several challenges to the closing argument on

behalf of Plaintiff Kennedy. First, they complain of a reference by Kennedy's counsel to the Nazi practice of telling concentration camp victims to remove their clothes for a "shower." The comment was inappropriate. After defense counsel objected, however, the court admonished counsel: "Well, this is not a concentration camp, and this was not Nazi Germany, and this is the United States of America. We still have a constitution; let's keep it in line with what we've got." Despite the impropriety of counsel's remark, we do not find reversible error. The district court's comment pointed out to the jury how off base counsel had been.

■■■ (60) Also during final argument to the jury, Kennedy's attorney narrated a video collage of photographs taken from the Dexter High School 1992 yearbook. Defendants preserved below only one objection raised on appeal with respect to this portion of the argument—an objection to the musical background played to the jury while the video was being shown. We agree with Defendants that the musical background had no place in the courtroom. Nevertheless, again we are skeptical that the music changed the result at trial. We find no *reversible* error in the district court's overruling the objection to the music.

(61) Defendants also contend that Kennedy's attorney misrepresented that a photograph of the beating of Rodney King that appeared in the video collage was taken from the high school yearbook. But such a picture appears in the yearbook. There was no misrepresentation by Kennedy's counsel. We note the glaring inappropriateness of using an irrelevant and inflammatory photograph at trial; but Defendants have not properly raised this issue on appeal.

## VIII. Instruction on Compensatory Damages

■■■ (62) Defendants requested the following jury instruction:

If you find that the plaintiffs' constitutional rights to be free of unreasonable searches have been violated, you are not to compensate the plaintiffs based on the importance of the constitutional rights. You may only compensate plaintiffs for actual injuries which have been proven at trial by a preponderance of the evidence.

The instruction accurately states the law. *See Carey v. Piphus*, 435 U.S. 247, 264–65, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978); *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308–10, 106 S.Ct. 2537, 2543–45, 91 L.Ed.2d 249 (1986). It would not have been error for the district court to give the instruction.

(63) At the same time, however, the failure to give the instruction also was not reversible error. The court instructed the jury that if it found liability, it should award the amount of money that would

reasonably and fairly compensate [Plaintiff] for any of the following elements of damages proved by [Plaintiff] to have resulted from the violation of [Plaintiff's] constitutional rights as claimed:

1. Humiliation and embarrassment resulting from the strip search of [Plaintiff's] person.

2. The pain and suffering experienced and reasonably certain to be experienced in the future. . . .

3. The nature, extent, and duration of the harm.

Defendants do not, and could not, contend that any of these elements of damages were improper. Given that the court instructed the jury regarding what were the proper elements of damages, it was not error for the court to refuse to give an instruction describing one inappropriate element of damages.

(64) Defendants contend on appeal that the district court's failure to give the requested instruction permitted Ford's counsel to argue for inappropriate damages in his closing argument. We agree that a portion of the closing argument could have misled the jury in this regard. But Defendants did not object on this ground during final argument. If they had done so, the district court may have reconsidered its prior refusal to give the tendered instruction or corrected Ford's counsel in some other way. This claim of error was not preserved below. Rule 12–216(A) NMRA 1997. Hence, we find no reversible error.

## IX. Attorney's Fees

■ (65) Plaintiffs were awarded attorney's fees pursuant to 42 U.S.C. § 1988. This being a federal statute, federal law governs the standards for the award of attorney's fees. *See Maine v. Thiboutot,* 448 U.S. 1, 10–11, 100 S.Ct. 2502, 2507–08, 65 L.Ed.2d 555 (1980); *Howlett ex rel. Howlett v. Rose,* 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (federal law governs § 1983 actions); 2 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* § 17.4 (2d ed.1991); *cf. Johnson,* 118 N.M. at 798, 887 P.2d at 1265 (§ 1983 action in state court is subject to federal remedies). The provisions of § 1988 relating to attorney's fees were enacted in 1976 as the Civil Rights Attorney's Fees Awards Act of 1976. Within 15 years the United States Supreme Court had addressed § 1988 fee issues in more than 30 decisions. *See* 2 Schwartz & Kirklin, *supra,* § 17.5, at 8. The Supreme Court obviously considers the proper determination of attorney's fees to be a matter of some importance. "We are bound by decisions of the United States Supreme Court affecting federal law." *Walker v. Maruffi,* 105 N.M. 763, 766, 737 P.2d 544, 547 (Ct.App.1987) (§ 1983 statute of limitations).

■ (66) The Supreme Court has directed that an award of attorney's fees to the prevailing party should be calculated under the "lodestar" method. *See* 2 Schwartz & Kirklin, *supra,* §§ 17.2, 20.1. This method entails multiplying (1) the number of hours of work for which the attorney should be compensated by (2) the appropriate hourly rate for the attorney. *See Blanchard v. Bergeron,* 489 U.S. 87, 94–95, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989); *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). Adjustments can then be made to the lodestar rate for exceptional circumstances. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 561–68, 106 S.Ct. 3088, 3096–3100, 92 L.Ed.2d 439 (1986) (noting strict limits on departing from lodestar figure); *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Not all hours expended on the case should be considered in computing the lodestar fee. The Supreme Court stated that the fee should be based on only hours that were "reasonably expended." Unreasonably expended hours would include:

1. Hours that are excessive in relationship to the task performed,

2. Hours that are redundant or duplicative because of the unnecessary time spent by multiple attorneys on the same task, and

3. Hours that are otherwise unnecessary or inappropriate because the task is not one that is properly compensable at all under § 1988.

2 Schwartz & Kirklin, *supra,* § 20.1, at 142; *see Hensley,* 461 U.S. at 434–36, 103 S.Ct. at 1939–41. In determining what hours are properly included, both counsel and the court must keep in mind that " '[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.' " *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940 (quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (en banc)).

■ (67) The party seeking the award bears the "burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *see* 2 Schwartz & Kirklin, *supra,* § 20.12. How detailed must the record keeping be? Although counsel "is not required to record in great detail how each minute of his time was expended," *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12, there must certainly be sufficient detail to assure compliance with the *Hensley* standards. As stated by Chief Justice Burger in his concurrence in *Hensley:*

I read the Court's opinion as requiring that when a lawyer seeks to have his adversary pay the fees of the prevailing party, the lawyer must provide detailed records of the time and services for which fees are sought. It would be inconceivable that the prevailing party should not be required to establish at least as much to support a claim under 42 U.S.C. § 1988 as a lawyer would be required to show if his own client challenged the fees. . . .

A claim for legal services presented by the prevailing party to the losing party pursuant to § 1988 presents quite a different situation from a bill that a lawyer presents to his own client. In the latter case, the attorney and client have presumably built up a relationship of mutual trust and respect; .... [T]here is, of course, no relationship of trust and confidence between the adverse parties. As a result, the party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed.

*Id.* at 440–41, 103 S.Ct. at 1943 (Burger, C.J., concurring).

(68) Our review of the case law indicates that courts uniformly require detailed time records for the award of attorney's fees under § 1988. Contemporaneously prepared time sheets, although not absolutely required, are strongly preferred. *See Webb v. Board of Educ.,* 471 U.S. 234, 238 n. 6, 105 S.Ct. 1923, 1926 n. 6, 85 L.Ed.2d 233 (1985); *Carter v. Sedgwick County, Kan.,* 929 F.2d 1501, 1506 (10th Cir.1991); *Cruz v. Local Union No. 3 of the IBEW,* 34 F.3d 1148, 1160–61 (2d Cir.1994) (no fee to be awarded unless contemporaneous time records); *Keenan v. City of Philadelphia,* 983 F.2d 459, 473–74 (3d Cir.1992); *Tedesco v. City of Stamford,* 24 Conn.App. 377, 588 A.2d 656, 660 (1991) (following Second Circuit and denying fee for lack of contemporaneous time records); *see generally* 2 Schwartz & Kirklin, *supra,* § 20.14 (2d ed.1991 & Supp.1996); *cf. Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 326–27 (5th Cir.1995) (antitrust case).

(69) We need not decide on this appeal how much detail is required. The evidence regarding hours worked by Plaintiffs' counsel is clearly inadequate for the trial court to perform the task required by *Hensley.* Counsel submitted no time sheets, not even reconstructed ones. The only evidence of hours worked were affidavits. The pertinent paragraph in the affidavit of Ford's attorney states:

The approximate number of hours of attorney's time involved on this case from 1992 to present is 400 hours. In general, that time was spent interviewing witnesses, conducting research, meeting with co-counsel, conducting discovery including interrogatories and depositions, preparing for the trial itself, defending against defense motions and appeals, defending defense motions in federal court, conducting a settlement conference, pre-trial hearings and five days of trial.

The affidavit by Kennedy's attorney was even briefer. It simply states: "The approximate number of hours of attorneys [sic] time involved on this case from March, 1992 to the present is approximately 600 hours." As argued by defense counsel, the affidavits were far too vague for him to determine, much less challenge, whether there were any unreasonable expenditures of attorney's time. *See Stewart v. Gates,* 987 F.2d 1450, 1452–53 (9th Cir.1993) (time records were so illegible that they "prevented a fair adversary process in which defendants could challenge the fee request" and "prevented detailed findings on the reasonable number of hours expended by him"; it was "abuse of discretion to award fees for hours not properly documented").

(70) Plaintiffs' attorneys provided unsworn explanations of the affidavits at the hearing on attorney's fees, but the explanations added little. Ford's attorney stated:

I simply estimated by going—working back from the trial and looking at the segments of—segments and elements of procedural law that I had conducted. As indicated in my affidavit I think I say generally what those are. For instance, there are five—there are five days of trial, and those are like 16 hour—16-hour days at that time. There are weeks of preparation for trial, there are X number of depositions, there are trips to Lovington, there are trips to Carlsbad, there are phone calls made, there are communications with clients, there are conferences with co-counsel, there's a settlement conference, there's a motion hearings, there are—there is some research for the removal issue, there is some research on the summary judgment issue, and I may be leaving out—

there is an investigation in talking to some witnesses.

When the court later asked Kennedy's attorney to provide an explanation for his affidavit, he said:

Somewhat the same. The difference in our hours is I was lead counsel in this for a long period of time. I financed him, advanced [?] some money to do the case. As things developed and we got the consolidation of the two cases, it became apparent that I could not try both cases. Our interests were going to be different at the trial. And even at that stage, we divided some of the things.

You may remember that [Ford's attorney] did all the voir dire, I did none of it. We divided the rest, names [?] of witnesses as who would take the lead in that respect. But mine was more intensive at the earlier stages. Mine was more intensive at the investigation stage, and mine was substantially more expensive when it came to advancing funds and prosecuting the action from that respect.

The trial I think was basically equal at that stage, but we had separate clients to represent. Same fashion, going back and looking at the time, I think my time is conservative as well. I don't think there's anything extra there.

(71) Plaintiffs' counsel do not need to make any further showing regarding the time they spent in court. But otherwise they have not established the requisite basis for a fee award pursuant to § 1988. They did not satisfy their burden of "documenting the appropriate hours expended." *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. We do not, however, direct that no fee at all be awarded. The proper disposition is to remand to the district court for further proceedings. (Such proceedings would be necessary in any event, because of our reversal of portions of the judgment.) Although Plaintiffs' attorneys should have been aware of the requirements for fee awards under § 1988, they may have relied (improperly) on state law that has not imposed the same requirements. *See Lucero v. Aladdin Beauty Colleges*, 117 N.M. 269, 871 P.2d 365 (1994). We therefore afford counsel an opportunity to reconstruct suffi-

ciently detailed time records, yet we note that some courts have applied a discount to the lodestar amount because of the absence of contemporaneously prepared time records. *See, e.g., Hensley*, 461 U.S. at 438 n. 13, 103 S.Ct. at 1942 n. 13 (observing that district court imposed 30% reduction in claimed hours, partly because of absence of contemporaneous time records); *cf. Tennessee Gas Pipeline Co. v. 104 Acres of Land*, 32 F.3d 632, 634 (1st Cir.1994) (fee award under 42 U.S.C. § 4654; 30% reduction because of numerous inadequate entries in time records). Plaintiffs are not entitled to recover under § 1988 for attorney's time to reconstruct hours spent on the case. *See Lewis v. Coughlin*, 801 F.2d 570, 577 (2d Cir.1986). In future cases the failure to provide contemporaneously prepared records in support of a fee request under § 1988 may justify even total rejection of the request. *See* 2 Schwartz & Kirklin, *supra*, § 19.14.

## X. Prejudgment Interest

■ (72) Defendants challenge the award of prejudgment interest on two grounds. First, they argue that the district court applied the wrong interest rate. They contend that federal law controls the interest rate because prejudgment interest is an element of damages, and therefore the district court should have computed interest in accordance with 28 U.S.C. § 1961. We reject the contention.

(73) Assuming the premise—that prejudgment interest constitutes part of the damage award—Defendants' contention is supported by the great weight of authority. Several courts have held that federal law governs prejudgment interest on a § 1983 claim. *See Furtado v. Bishop*, 604 F.2d 80, 97 (1st Cir. 1979) (availability of prejudgment interest on § 1983 claim is matter of federal law because of the close relationship of interest to the issue of damages); *Savarese v. Agriss*, 883 F.2d 1194, 1207 (3d Cir.1989) (same); *Golden State Transit Corp. v. City of Los Angeles*, 773 F.Supp. 204, 208–10 (C.D.Cal.1991); *L.A. Ray Realty v. Cumberland*, 698 A.2d 202, 214 (R.I.1997); 2 Schwartz & Kirklin, *supra*, § 16.15; *cf. Johnson*, 118 N.M. at 798, 887 P.2d at 1265. Other courts have held that federal law governs the award of prejudgment interest on claims arising under other

federal statutes. *See Gorenstein Enters. v. Quality Care–USA,* 874 F.2d 431, 436 (7th Cir.1989) (Lanham Act); *Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1330 (8th Cir. 1995) (ERISA); *Connecticut Gen. Life. Ins. Co. v. Cole,* 821 F.Supp. 193, 202 (S.D.N.Y. 1993) (ERISA); *Cramer v. Association Life Ins. Co.,* 619 So.2d 821, 826 (La.Ct.App.1993) (ERISA); *cf. Aubin v. Fudala,* 782 F.2d 287, 289 (1st Cir.1986) (Breyer, J.) (state law governs prejudgment interest when claim arises under state law, citing *Furtado* ). Although decisions in two federal circuits have indicated that state law governs an award of prejudgment interest in a § 1983 action, *see Pressey v. Patterson,* 898 F.2d 1018, 1026 (5th Cir.1990); *Winter v. Cerro Gordo County Conservation Bd.,* 925 F.2d 1069, 1073 (8th Cir.1991), those decisions are of questionable authority. *Pressey* relied on earlier decisions in the circuit that did not confront the choice-of-law issue, *Winter* contained no discussion of the choice-of-law issue, and subsequent decisions in both circuits have stated that federal law governs the award of prejudgment interest on a federal cause of action, *Carpenters Dist. Council v. Dillard Dep't Stores,* 15 F.3d 1275, 1288 (5th Cir. 1994); *Mansker,* 54 F.3d at 1330.

(74) On the other hand, the above authority may not be controlling with respect to an award of prejudgment interest in a state district court in New Mexico. Our courts have characterized prejudgment interest as a management tool or penalty to deal with litigation conduct, rather than as part of the damage award. *See Sunwest Bank v. Colucci,* 117 N.M. 373, 378, 872 P.2d 346, 351 (1994). *But cf. Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 105–06, 112 S.Ct. 2374, 2386–87, 120 L.Ed.2d 73 (1992) (state cannot avoid federal preemption by the way in which it articulates the purpose of state law).

(75) In any event, we need not decide that question. Even if federal law governs, the district court was not required to award interest at the United States treasury bill rate as required by 28 U.S.C. § 1961. That section governs only post-judgment interest. Under federal law the district court has discretion regarding the pre-judgment rate to apply. *See, e.g., Sun Ship, Inc. v. Matson Navigation Co.,* 785 F.2d 59, 63 (3rd Cir.

1986) *EEOC v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566, 579 (6th Cir. 1984); *Smith v. American Int'l Life Assurance Co.,* 50 F.3d 956, 957–58 (11th Cir.1995); *but see Blanton v. Anzalone,* 813 F.2d 1574, 1576 (9th Cir.1987) (court should use 28 U.S.C. § 1961 to compute prejudgment interest rate unless equities demand otherwise). We note that the New Mexico statute regarding prejudgment interest also grants the trial court discretion with respect to the interest rate. NMSA 1978, Section 56–8–4(B) (1993) begins with the language: "The court in its discretion may allow interest of up to ten percent...." Given that the district court necessarily exercised discretion, we see no basis to disturb the prejudgment interest rate set by the court on the compensatory damage award.

(76) Defendants' second ground for challenging the award of prejudgment interest is that prejudgment interest cannot be added to an award of punitive damages. Because we have set aside the punitive-damage awards, we need not address this issue.

## CONCLUSION

(77) We affirm the judgment against Dexter Consolidated Schools. We reverse the judgment against Kent Perry for compensatory and punitive damages, because he was entitled to qualified immunity. We reverse the judgment in favor of Randy Ford against James Derrick because Derrick was entitled to qualified immunity on that claim. We reverse the award of punitive damages to Crystal Kennedy against Sue Rodriguez because of insufficient evidence of the requisite state of mind. We reverse the judgments against Donald Warren for compensatory and punitive damages, the judgment against Sue Rodriguez for compensatory damages, and the judgment in favor of Kennedy against Derrick, but we remand for retrial of those claims. We also reverse the award of attorney's fees and remand for further proceedings in that regard.

(78) **IT IS SO ORDERED.**

PICKARD and FLORES, JJ., concur.