10 P.3d 115

2000-NMSC-025

Crystal KENNEDY and Randy Ford, Plaintiffs–Petitioners,

v.

DEXTER CONSOLIDATED SCHOOLS, Donald Warren, Kent Perry, Sue Rodriguez, and James Derrick, Defendants–Respondents.

No. 24,988.

Supreme Court of New Mexico.

Aug. 14, 2000.

Tandy Hunt, Randy Clark, Stout & Winterbottom, Michael L. Stout, Roswell, for Petitioners.

Simons, Cuddy & Friedman, LLP, Robert D. Castille, Santa Fe, for Respondents.

## OPINION

FRANCHINI, Justice.

{1} In March 1992, Dexter High School students Crystal Kennedy and Randy Ford were forced to submit to strip searches, conducted by school officials, in the vain attempt to recover a third student's missing ring. Pursuant to the federal Civil Rights Act of 1871, 42 U.S.C. § 1983 (1998), a jury awarded compensatory damages against the school district and four school officials, punitive damages against three of the officials, and attorney's fees to Plaintiffs. In *Kennedy v. Dexter Consolidated Schools*, 1998–NMCA–051, 124 N.M. 764, 955 P.2d 693, the Court of Appeals affirmed the compensatory damages against the school district, but reversed all judgments against individual Defendants on at least one of the following grounds: (1) two of the school officials were entitled to qualified immunity for the strip-to-undergarments search of Randy Ford because while that search violated his rights, those rights were not "clearly established" in 1992; (2) two Defendants deserved qualified immunity because their participation in the search was insufficient to hold them liable; and (3) the jury was improperly instructed that the pre-search detention of the students constituted a separate cause of action. The Court also held that: (4) punitive damages were inappropriate with regard to two Defendants, and (5) attorney's fees were improperly awarded because Plaintiffs' counsel did not supply adequate evidence of the number of hours worked on the case.

{2} We hold: (1) the strip-to-undergarments search of Randy Ford violated his clearly established rights in 1992, and the school officials therefore are not entitled to qualified immunity for that search; (2) where the jury determined that Defendants proximately caused the violation of the students' constitutional rights, the specific involvement of each Defendant is irrelevant to a qualified immunity inquiry; (3) the jury instruction on the pre-search detention was improper but harmless and did not constitute reversible error; (4) evidence presented at trial supported the jury's award of punitive damages; and (5) under 42 U.S .C. § 1988 (1998), attorney's fees cannot properly be awarded absent specific evidence of hours expended. We reverse in part and affirm in part. We reinstate all trial court judgments except at-

torney's fees, which we remand for further proceedings.

## FACTS AND PROCEDURE

{3} In March 1992, a Dexter High School student reported to her teacher, Randy Ragland, that she was missing a diamond ring. Mr. Ragland and some of the fourteen and fifteen-year-old students in the class searched the room for the ring. When the search failed, Mr. Ragland ordered his students to remain in the classroom, ·even though the class period had ended, while he conferred with Principal Warren and other school officials. Some of the officials who were discussing now to proceed had conducted a similar strip search three years earlier. Superintendent Derrick, Counselor Perry, and Ms. Rodriguez had been involved in the 1989 blanket strip search of thirty-five Dexter junior high students in an attempt to recover a missing eight dollars. In response to public criticism, Superintendent Derrick, who was then Principal at the junior high school, had promised that no such strip searches would occur again.

{4} In this case, by the time the school officials determined their course of action, the students had been detained in the classroom through another entire class period without being permitted to use the bathroom. Finally, the officials began to ask for volunteers. Thinking that she would have the opportunity to go to the bathroom, Crystal raised her hand. She was escorted to the bathroom by Ms. Rodriguez and a female teacher. As Crystal urinated, she was ordered to keep the bathroom stall open and to lift her blouse while Ms. Rodriguez watched. This, presumably, would have allowed Ms. Rodriguez to observe whether Crystal, an honor student with no history of disciplinary problems, was attempting to dispose of the ring while urinating. When the ring was not found, Crystal was told to leave her pants and underwear down while the two officials inspected her. Crystal then pulled up her underpants and sat down in order to remove her socks and shoes. After standing up again, she was ordered to remove her shirt and pull her bra away from her body. With school officials in front of and beside her, she pulled her bra, exposing her breasts.

{5} Randy Ford, who may not have entered the classroom until after the ring was reported missing, underwent a similar search. Once in the bathroom, Principal Warren and another school official watched from behind as Randy urinated. When he finished, Randy was told not to button up his pants. He followed orders to disrobe, and stripped himself to his boxer shorts. At this point, the two school officials demanded that he pull his underpants away from his waist and shake them, thereby freeing any object he may have had hidden there.

{6} Crystal and Randy sued the Dexter School District and six school employees, alleging that the searches violated their Fourth Amendment rights and that they were entitled to damages under Section 1983. At trial, the jury found that school employees, acting pursuant to school policy, had violated the Plaintiffs' constitutional rights and that those actions were the proximate cause of harm to both students. Accordingly, a judgment was entered against the Dexter School District and five of the individual employees who the jury determined were involved in the illegal searches. The jury awarded each Plaintiff $50,000 in compensatory damages against the school and the individual Defendants. In addition, the jury awarded punitive damages of $50,000 against Principal Warren to both students; $25,000 against Counselor Perry to both students; and $25,000 against Ms. Rodriguez to Crystal Kennedy. The trial court entered judgments accordingly. Finally, after conducting a post-trial hearing, the trial court awarded attorney's fees pursuant to Section 1988.

{7} After affirming the trial court's judgment against the Dexter School District, the Court of Appeals reversed the judgments against the individual Defendants on various grounds. First, the Court determined that the strip-to-undergarments search of Randy Ford did not violate clearly established law in 1992. *See Kennedy*, 124 N.M. 764, 955 P.2d 693, 1998–NMCA–051, ¶ 41. Second, the Court analyzed the specific involvement of each Defendant and determined that Counselor Perry's limited participation in the searches afforded him qualified immunity from liability for the searches of both Plain-

tiffs, and that Superintendent Derrick's involvement in the search of Randy Ford was too attenuated to subject him to liability for that search. *See id.* ¶¶ 44–46. Because they were entitled to qualified immunity, neither Superintendent Derrick nor Counselor Perry could be retried for those searches. *See id.* Third, the Court set aside the compensatory and punitive damages awarded against all individual Defendants because a theory of liability from which Defendants were qualifiedly immune had erroneously been included in the jury instructions. *See id.* ¶ 48. The judgments against Defendants Derrick, Perry, Warren and Rodriguez were therefore reversed and remanded. Fourth, the Court overturned the trial court's award of punitive damages against Counselor Perry and Ms. Rodriguez on the grounds of qualified immunity and insufficiency of evidence, respectively. *See id.* ¶¶ 50–53. Finally, the Court overturned the award of attorney's fees and remanded that issue to the district court for further proceedings. *See id.* ¶¶ 65–71.

{8} We granted certiorari to discuss the following issues: (1) whether, for purposes of qualified immunity, the strip-to-undergarments search of Randy Ford violated clearly established law in 1992; (2) whether the lesser degree of participation of Counselor Perry and Superintendent Derrick entitles them to qualified immunity for the searches of all the students; (3) whether the erroneous jury instruction constitutes reversible error; and (4) whether the trial court properly awarded attorney's fees. We reverse the Court of Appeals' rulings as to the first three issues, and affirm and remand to the district court on the fourth. We also deem it necessary in our disposition of the appeal to address the issue of punitive damages due to its relationship with the issue of qualified immunity.

**SECTION 1983**

{9} Plaintiffs seek damages for the denial of their federal constitutional rights pursuant to Section 1983, which reads, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdic-

tion thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

State and federal courts share concurrent jurisdiction over Section 1983 claims for the denial of federal constitutional rights. *See Martinez v. California,* 444 U.S. 277, 283 n. 7, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Carter v. City of Las Cruces,* 1996–NMCA–047, ¶ 5, 121 N.M. 580, 915 P.2d 336. The Court of Appeals did not, nor do we now, disturb the trial court's finding that the constitutional rights of Crystal and Randy had been violated or its resulting award of compensatory damages against the school district. On appeal, we question only the liability of Defendants in their individual capacities.

**QUALIFIED IMMUNITY**

{10} All Defendants assert that qualified immunity insulates them from liability. Qualified immunity protects government officials from lawsuits that, although colorable, would inhibit or disrupt governmental operations. *See Harlow v. Fitzgerald,* 457 U.S. 800, 813–16, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is generally available to government officials performing discretionary functions, but with one important limitation: immunity will not be granted to officials who should have known that their conduct violated the law. *See id.* In order to determine whether an official should have known that her conduct was unlawful, we question: (1) whether Defendant's alleged conduct violated a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged conduct. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Romero v. Sanchez,* 119 N.M. 690, 692, 895 P.2d 212, 214 (1995); *Flores v. Danfelser,* 1999–NMCA–091, ¶ 24, 127 N.M. 571, 985 P.2d 173; *see also Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official understands that what he is doing violates

that right." *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034.

### Qualified Immunity for the Strip–to–Undergarments Search

■ {11} The Court of Appeals determined that the school officials' conduct violated the students' general Fourth Amendment right not to be strip searched in school without being individually suspected of wrongdoing. *See Kennedy,* 1998–NMCA–051, ¶ 16, 124 N.M. 764, 955 P.2d 693. We agree. According to the Court, however, whether or not that right was clearly established in 1992 turned on the degree of nudity exhibited by the student. Thus, the Court decided that a strip search that resulted in a student's full nudity violated clearly established law in 1992. *See id.* ¶ 39. A strip search that ended with the otherwise naked student still clinging to his underpants, on the other hand, did not violate that student's clearly established rights. *See id.* ¶ 41. We now reverse the Court of Appeals and hold that, in 1992, the search of Randy Ford violated not only his clearly established right to be free from strip searches conducted without individualized suspicion, but also his clearly established rights to be free from searches that are not justified at their inception and are clearly excessive in scope.

{12} We address this issue with some hesitation because although the Court of Appeals devoted much of its opinion to the conclusion that the unconstitutionality of the s trip-to-undergarments search was not clearly established as of 1992, the Court never applied that conclusion to the case at bar. *See id.* ¶¶ 45–47. Rather, the Court's qualified immunity ruling depended upon factual analyses of the respective involvements of each individual Defendant. *See id.* Nevertheless, because the Court of Appeals' determination that the strip-to-undergarments search of Randy Ford did not violate clearly established law provides a latent source of qualified immunity for these or other school officials, we are compelled to rule upon the issue.

{13} The United States Supreme Court has recognized that an inquiry into whether official conduct violates "clearly established" law "depends substantially upon the level of generality at which the relevant legal rule is to be identified." *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034. The *Anderson* Court pointed out that too general a characterization of the legal rule in question (e .g. "due process of law") would effectively subtract the "clearly established" requirement from the doctrine and eliminate a state official's ability to predict whether or not her conduct might give rise to liability. *See id.* Importantly, the Supreme Court also cautioned against requiring too specific a correlation between the misconduct and the established law, refusing to hold that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* at 640, 107 S.Ct. 3034. Rather, in order for state action to violate clearly established law, the unlawfulness must be apparent "in light of pre-existing law." *Id.*

{14} In questioning whether the nude search of Crystal violated clearly established law, our Court of Appeals relied heavily upon the Tenth Circuit's approval of *Doe v. Renfrow,* 631 F.2d 91 (7th Cir.1980), in *Walters v. Western State Hosp.,* 864 F.2d 695, 699–700 (10th Cir.1988). *Kennedy,* 1998–NMCA–051, ¶¶ 39–40, 124 N.M. 764, 955 P.2d 693. In *Renfrow,* the Seventh Circuit wrote, "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude." *Renfrow,* 631 F.2d at 92–93. Relying on the Tenth Circuit's approval of *Renfrow,* as well as the overall "common sense of the proposition," the Court of Appeals ruled that "at least individualized reasonable suspicion is required before school officials can conduct a nude search for a missing ring." *Kennedy,* 1998–NMCA–051, ¶ 40, 124 N.M. 764, 955 P.2d 693.

■ {15} We agree with the Court of Appeals' use of common sense for the purposes of determining whether the search of Crystal violated clearly established law. *See DeBoer v. Pennington,* 206 F.3d 857, 864–65 (9th Cir.2000) (holding that a right may be established by common sense as well as by closely analogous case law); *Newell v. Sauser,* 79 F.3d 115, 117 (9th Cir.1996); *Wood v.*

*Ostrander,* 879 F.2d 583, 590 (9th Cir.1989). The Court of Appeals failed, however, to apply an equal measure of common sense to the search of Randy. The same common sense that compels the conclusion that a school official cannot strip a child naked without having some individualized basis to suspect that child of wrongdoing, also mandates that a child cannot be stripped to his boxer shorts by officials who have no reason to suspect him individually. If, as the United States Supreme Court suggested in *Anderson,* law casts light, then certainly the illegality of a strip-to-undergarments search conducted without individualized suspicion falls squarely within the light cast by law forbidding a strip-to-nude search conducted without individualized suspicion. 483 U.S. at 639, 107 S.Ct. 3034. While forcing the exposure of a child's genitals is more invasive than forcing the exposure of a child's chest, midriff, thighs, and underwear, we cannot accept that this distinction marked the outer boundary of the breadth of clearly established Fourth Amendment rights in 1992. We hold that in light of the Tenth Circuit's affirmation of *Renfrow,* the unlawfulness of conducting a strip-to-undergarments search without individualized suspicion was clearly established in 1992. *See Renfrow,* 631 F.2d at 92–93.

■ {16} Although we believe that the lack of individualized suspicion was enough to clearly establish the illegality of the search of Randy Ford, Plaintiffs also argue that the Court of Appeals improperly limited itself to this issue, when the lack of individualized suspicion represents only one of the elements contributing to the illegality of the search. We agree. In addition to his right to be free from a strip search conducted without reasonable suspicion, Randy had clearly established rights to be free from searches that are not justified at their inception and from searches that are excessive in scope. *See New Jersey v. T .L.O.,* 469 U.S. 325, 341–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). We hold that these clearly established rights were violated by the school officials as well.

■ {17} It was clearly established in 1992 that in order for a school search to be valid, it must be justified at its inception.

*See id.; see also Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (generally). A search is justified at its inception when "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.,* 469 U.S. at 342, 105 S.Ct. 733; *see also State v. Michael G.,* 106 N.M. 644, 646, 748 P.2d 17, 19 (Ct.App.1987); *Doe v. State,* 88 N.M. 347, 352, 540 P.2d 827, 832 (Ct.App.1975). In *T.L.O.,* a teacher discovered two girls smoking in the bathroom. 469 U.S. at 328, 105 S.Ct. 733. After one of the girls later denied smoking, the Assistant Principal searched the girl's purse and found cigarettes and rolling papers. *Id.* Associating the rolling papers with marijuana use, the school official continued looking through the purse whereupon he discovered a stash of marijuana and evidence of drug dealing. *Id.* The Supreme Court held that the search of the purse was justified by the fact that the official conducting the search had received a report from a teacher specifically alleging that he had witnessed the student engaging in illicit conduct. *Id.* at 345–46, 105 S.Ct. 733. Similarly, in *Michael G.,* the Court of Appeals based its determination that the search of a student's locker for marijuana was justified by the fact that the information precipitating the search was provided by an eyewitness to the student's attempt to distribute the drug. 106 N.M. at 647, 748 P.2d at 20. In *Doe,* the Court of Appeals upheld the search of student who had been detained and required to turn over a marijuana pipe from which school officials had seen the student smoking. 88 N.M. at 352–53, 540 P.2d at 832–33. Thus, the officials responsible for the searches in *T.L.O., Michael G.,* and *Doe* proceeded not only with individualized suspicion, but with eyewitness information that an infraction had occurred.

■ {18} Unlike *T.L.O., Michael G.,* and *Doe,* there was no individualized suspicion in the present case. Neither did the school officials rely on the information of an eyewitness. In fact, the decision to strip search all the students in Mr. Ragland's class was not justified by any information other than the circumstance of the missing ring. It had

never been made clear, nor is it presently so, that any crime or violation of school rules had ever occurred. Under these circumstances, the search of Randy Ford violated his clearly established right to be free from searches that are unjustified at their inception.

{19} *T.L.O.* also clearly established that a school search must be permissible in scope. A search is permissible in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 105 S.Ct. 733, 469 U.S. at 342. Here, requiring a student to strip to his underwear while being watched by two school officials is clearly excessive in light of his youth, the significant possibility that the ring was simply lost and no infraction ever occurred, and the non-dangerousness of the hypothesized infraction. Regardless of the degree of the student's physical exposure, subjecting a student to any strip search under these circumstances constitutes a violation of his clearly established rights.

## The Specific Involvement of Counselor Perry and Superintendent Derrick

{20} Notwithstanding the amount of analysis devoted by the Court of Appeals to the question of whether a strip-to-undergarments search conducted without individualized suspicion violates clearly established law, its qualified immunity rulings actually depended on an analysis of the specific involvement of Superintendent Derrick and Counselor Perry in the two searches. According to the Court of Appeals, Counselor Perry was qualifiedly immune from liability for both searches because there was insufficient evidence linking his actions to the searches. *See Kennedy*, 1998–NMCA–051, ¶ 44, 124 N.M. 764, 955 P.2d 693. Superintendent Derrick's failure to train school employees that a strip-to-nude search could not be conducted without individualized reasonable suspicion subjected him to liability for the search of Crystal. *See id.* ¶ 42. He was qualifiedly immune from liability for the search of Randy, however, because Randy was not present when the ring was declared

missing, and, the Court concluded, Superintendent Derrick had no duty to train school personnel "not to search patently innocent students." *Id.* ¶ 46. We hold that in immunizing Counselor Perry and Superintendent Derrick for their involvement in the search of Randy Ford, the Court of Appeals improperly reweighed the evidence.

{21} A reviewing court may not reweigh evidence or substitute its judgment for that of the factfinder. *See State v. Clifford*, 117 N.M. 508, 512, 873 P.2d 254, 258 (1994). In the present case, the jury heard evidence suggesting that Counselor Perry conferred with Principal Warren prior to the search, threatened the students with a strip search, and ignored the children's protests. Evidence also suggested that Superintendent Derrick failed to enunciate a policy that would protect the students from searches such as these. Based on this evidence the jury determined that both Counselor Perry and Superintendent Derrick had proximately caused a violation of the Plaintiffs' constitutional rights. The Court of Appeals analyzed the same evidence upon which the jury had relied, but came to opposite conclusions. The Court determined that the evidence against Counselor Perry "is not sufficient to impose liability." *See Kennedy*, 1998–NMCA–051, ¶ 44, 124 N.M. 764, 955 P.2d 693. With regard to Superintendent Derrick, the Court held that he enjoys qualified immunity because he "was out of town at the time of the search and had no direct involvement in it." *See id.* ¶ 46. We hold that in coming to these conclusions, the Court of Appeals improperly re-evaluated the evidence.

{22} Qualified immunity requires an inquiry into the extent to which the right allegedly violated is clearly established in light of pre-existing law. *See Romero*, 119 N.M. at 692, 895 P.2d at 214; *Harlow*, 457 U.S. at 816, 102 S.Ct. 2727; *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034. This inquiry is legal in nature. *See Carrillo v. Rostro*, 114 N.M. 607, 615, 845 P.2d 130, 138 (1992). Here, the Court of Appeals' qualified immunity holding rested upon its own interpretation of the facts, rather than upon legal analysis. Thus, apart from constituting an improper reweigh-

ing of the evidence, the Court's attempt to causally separate Counselor Perry and Superintendent Derrick from the searches has no bearing on the legal question of whether the right allegedly violated is clearly established. We reverse the Court of Appeals' holding that Counselor Perry and Superintendent Derrick are entitled to qualified immunity.

## THE JURY INSTRUCTION

{23} The Court of Appeals held that the inclusion of a jury instruction that provided for potential liability for the pre-search detention of the students should have been omitted because it failed to account for Defendants' qualified immunity from that particular theory of liability. *See Kennedy*, 1998–NMCA–051, ¶ 48, 124 N.M. 764, 955 P.2d 693. The relevant instruction reads:

> To establish the claim of violation of Constitutional Rights by the Defendants, [Plaintiff] has the burden of proving at least one of the following contentions:
>
> 1. [Plaintiff] was unreasonably subjected to a search of [her/his] person; and/or
>
> 2. [Plaintiff] was unreasonably detained and not permitted to go to [his/her] classes or to use the restroom facilities[.]

The Court determined that the detention of the students did not violate clearly established law prior to 1992 and that Defendants were therefore entitled to qualified immunity from the separate theory of liability based on the detention. *See id.* ¶ 49. Relying on *Gerety v. Demers*, 86 N.M. 141, 143, 520 P.2d 869, 871 (1974), the Court ruled that the jury verdict must be set aside because the detention instruction was legally inadequate. *See Kennedy*, 1998–NMCA–051, ¶ 49, 124 N.M. 764, 955 P.2d 693. Accordingly, the judgments against all individual Defendants were reversed and remanded. *See id.*

{24} Plaintiffs claim that the Court of Appeals lacked jurisdiction to rule on the jury instructions because Defendants failed to preserve the issue at trial. *See* Rule 12–216 NMRA 2000. Indeed, Defendants neglected to record an objection to the jury instructions at the time that the instructions were tendered. However, an examination of the record reveals that Defendants did timely alert the trial court to its objection to the

jury instructions during a directed verdict colloquy in which they attempted to bar a separate claim for illegal detention. *See* Rule 1–046 NMRA 2000.

{25} The defect in the erroneous instruction lies in the fact that it extracted an illusory detention claim from the overall search claim despite the trial court's express ruling that the detention is "not a separate claim." Notwithstanding the renegade instruction, the remaining instructions required the jury to contemplate only an illegal search claim, not a separate detention claim. The liability instructions, for example, define the elements of an illegal search, without mentioning the elements of an illegal detention. The jury instructions regarding damages provide for compensation for harm resulting from the strip searches of the plaintiffs, but make no mention of potential damages for the detention. Finally, the jury instruction explaining the school officials' legal defense also omits any discussion of the detention:

> Defendants claim that it was reasonable to believe that one of the students in Mr. Ragland's class had just stolen a valuable diamond ring and that the search of this limited number of students was warranted after there had been a thorough search and each student had been privately interviewed.

Error certainly resulted from the fact that subpart two, of Jury Instruction No. 3, fractured the search claim into two separate theories, contradicting these instructions and the court's explicit ruling. The Court of Appeals' decision to treat qualified immunity for the detention separately from qualified immunity for the search perpetuates, rather than corrects, this error. In analyzing whether or not the faulty jury instruction constitutes reversible error, we address the erroneous division of the single claim, rather than the availability of qualified immunity for this falsely individuated claim.

{26} Having decided that the trial court erred in separating the single claim into parts, we must now decide whether that error requires reversal. In civil litigation, error is not grounds for setting aside

a verdict unless it is "inconsistent with substantial justice" or "affects the substantial rights of the parties." *See* Rule 1–061 NMRA 2000; *see also Fahrbach v. Diamond Shamrock, Inc.*, 1996–NMSC–063, 122 N.M. 543, 552, 928 P.2d 269, 278 (concluding that trial court's inclusion of another party was harmless error because it did not prevent substantial justice); *Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 733, 779 P.2d 99, 110 (1989) (holding erroneous admission of evidence was harmless to the issue of liability for breach of contract, but affected party's substantial rights on the issue of punitive damages); *cf. Mallard v. Zink*, 94 N.M. 94, 95–96, 607 P.2d 632, 633–34 (Ct.App.1979) (holding that erroneous granting of a directed verdict was reversible error). An error is harmless unless the complaining party can show that it created prejudice. *See Brooks v. K–Mart Corp.*, 1998–NMSC–028, ¶¶ 6–7, 125 N.M. 537, 964 P.2d 98 (concluding that a modification of jury instruction on store's duty to visitors adequately instructed jurors); *Jewell v. Seidenberg*, 82 N.M. 120, 124, 477 P.2d 296, 300 (1970) (concluding that failure to give appropriate Uniform Jury Instruction was not reversible error under the circumstances); *Gallegos v. New Mexico Bd. of Educ.*, 1997–NMCA–040, ¶ 37, 123 N.M. 362, 940 P.2d 468 (holding that refusal to tender Uniform Jury Instructions in an action brought under Tort Claims Act was not reversible error); *Thorp v. Cash (In re Ferrill)*, 97 N.M. 383, 392–93, 640 P.2d 489, 498–99 (Ct.App.1981) (refusing to reverse without the probability of a different verdict in the absence of the error). We compel the reversal of errors for which the complaining party provides the slightest evidence of prejudice and resolve all doubt in favor of the complaining party. *See Adams v. United Steelworkers of Am.*, 97 N.M. 369, 374, 640 P.2d 475, 480 (1982) (holding erroneous instructions in a wrongful discharge case was reversible error); *Jewell*, 82 N.M. at 124, 477 P.2d at 300.

{27} We will not set aside a judgment based on mere speculation that an erroneous jury instruction influenced the outcome of the case. *Fahrbach*, 122 N.M. at 552, 928 P.2d at 278. In *Fahrbach*, we held that a jury instruction based on a defense theory that had not been contained in the pretrial order was erroneous, but determined that the plaintiff's failure to offer any evidence that the instruction contributed to the jury's verdict rendered the error harmless. *Id.* at 550–52, 928 P.2d at 276–78. Here, Defendants have failed to provide any evidence of prejudice. Because we determine that Defendants were not prejudiced by the trial court's erroneous jury instruction, we hold that the error was harmless.

{28} The record supports this conclusion. In reviewing claimed error in jury instructions, we consider the instructions as a whole, and uphold them if, as a whole, they fairly represent the law applicable to the issue in question. *See Folz v. State*, 110 N.M. 457, 468, 797 P.2d 246, 257 (1990). When read in concert, the jury instructions confirm that the illegal search was the only theory of liability upon which the jury could base its decision. The jury's verdict also suggests that the jury awarded damages according to the illegal search theory alone. The jury declined to hold Mr. Ragland liable for any damages despite the fact that he conducted the detention. If the jury had recognized the detention of the students as a separate grounds for liability, it could not possibly have held the other officials liable for that detention while exculpating the person who, by all accounts, was directly responsible for it. The jury's exoneration of Mr. Ragland clearly shows that they found no Defendant liable for a separate unconstitutional detention. The error did not affect the jury and was therefore harmless. *Cf. Mallard*, 94 N.M. at 96, 607 P.2d at 634.

{29} The Court of Appeals' discussion of *Gerety v. Demers*, 86 N.M. 141, 520 P.2d 869 (1974), does not exempt Defendants from the burden of proving prejudice. In *Gerety*, we suggested in dicta that we assume prejudice where a jury instruction states a proposition of law not supported by evidence, even though a jury may have actually relied upon a separate, well-supported instruction. 86 N.M. at 143, 520 P.2d at 871. Cases arising since *Gerety* have demonstrated that its impact is limited to the inclusion of a jury instruction that is not supported by

the evidence. *See Scott v. Woods,* 105 N.M. 177, 187, 730 P.2d 480, 490 (Ct.App.1986) (reversing judgment where jury instruction failed to state a claim supported by evidence and the surrounding jury instructions failed to clarify jury's obligation); *Salinas v. John Deere Co.,* 103 N.M. 336, 341, 707 P.2d 27, 32 (Ct.App.1984) (holding that a jury instruction on a theory not supported by the evidence was reversible even though evidence existed to support other theories); *Perfetti v. McGhan Medical,* 99 N.M. 645, 655, 662 P.2d 646, 656 (Ct.App.1983) (concluding that because the jury was instructed on a theory of express warranty that was not supported by evidence, judgment must be reversed and remanded for trial that excluded express warranty theory from instructions). We are unwilling to expand this notion to situations in which, as here, the error stems from the severing of a single claim into two separate theories of liability. To expand *Gerety* to apply to technically erroneous jury instructions would create a virtual per se rule of reversible error for any and all erroneous jury instructions and would threaten to remove jury instructions from the ambit of the doctrine of harmless error. Such a misapplication of *Gerety* would be particularly inappropriate in the present case because the remaining jury instructions cured the error.

{30} In *First National Bank v. Sanchez,* we addressed a jury instruction similar to the one now in question. 112 N.M. 317, 322, 815 P.2d 613, 618 (1991). In *Sanchez,* we determined that although an instruction erroneously implied that duress constituted a separate theory of liability when that theory was actually subsumed by the larger breach of contract claim, the claim of duress was merely "another way to complain of the same act that formed the basis for the claimed breach of contract." *Id.* Although the jury instructions constituted reversible error for other reasons, we refused to reverse on the mistaken duress instruction alone. *See id.* In the present case, the erroneous detention instruction was merely another way to complain of the same act that formed the basis of the claimed illegal search. We are unwilling to contravene *Sanchez,* the New Mexico Rules of Appellate Procedure, and our harmless error jurisprudence, in order to extrapo-

late *Gerety* to apply to the facts of this case. Because the jury instruction was harmless, and because neither Counselor Perry nor Superintendent Derrick is entitled to qualified immunity, we reinstate the compensatory damages against Counselor Perry, Superintendent Derrick, Principal Warren and Ms. Rodriguez.

## PUNITIVE DAMAGES

{31} The jury awarded punitive damages against Counselor Perry, Principal Warren, and Ms. Rodriguez. The Court of Appeals affirmed the award against Principal Warren, but reversed the damages against Counselor Perry and Ms. Rodriguez. *See Kennedy,* 1998–NMCA–051, ¶¶ 50–53, 124 N.M. 764, 955 P.2d 693. The Court held that Counselor Perry's qualified immunity protected him from punitive damages, and that there was not sufficient evidence to support such damages against Ms. Rodriguez. *See id.* Because we hold that Counselor Perry was not qualifiedly immune from liability for either of the strip searches, we now analyze the jury's award of punitive damages against him and against Ms. Rodriguez as well.

{32} At trial, the jury was instructed that it could award punitive damages for "willful, wanton, or reckless" conduct. This instruction represents an adequate statement of the current law regarding punitive damages for Section 1983 violations. *See Smith v. Wade,* 461 U.S. 30, 38–48, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (discussing the availability of punitive damages when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent). The Court recognized "reckless indifference to whether [Defendant's] conduct violated the constitutional rights of the victim" as a sufficient culpable mental state to support punitive damages against Principal Warren. *Kennedy,* 1998–NMCA–051, ¶ 54, 124 N.M. 764, 955 P.2d 693. Recklessness requires indifference to the rights of the victim, rather than knowledge that the conduct will violate those rights. *See Torres v. El Paso Elec. Co.,* 1999–NMSC–029, ¶ 28, 127

N.M. 729, 987 P.2d 386 (stating "reckless-ness in the context of punitive damages refers to 'the intentional doing of an act with utter indifference to the conse-quences'" (quoting UJI 13–1827 NMRA 2000)). With regard to Ms. Rodriguez, however, the Court abandoned reckless-ness as a sufficiently culpable mental state to warrant punitive damages, and exempted her from punitive damages be-cause "there is no evidence that she knew the search was unlawful, much less uncon-stitutional." *Kennedy*, 1998–NMCA–051, ¶ 53, 124 N.M. 764, 955 P.2d 693. Con-trary to the Court's holding, the fact that Ms. Rodriguez may not have known that the search was unconstitutional does not spare her from punitive damages if she was indifferent to that possibility.

{33} In determining whether puni-tive damages are appropriate in the present case, we must question whether there exist-ed sufficient evidence to support a jury's finding of willfulness, wantonness, or reck-lessness toward the rights of Plaintiffs on the part of Counselor Perry and Ms. Rodri-guez. *See Sunwest Bank v. Daskalos*, 120 N.M. 637, 639, 904 P.2d 1062, 1064 (Ct.App. 1995). We hold that such evidence did exist. Although Counselor Perry did not physically administer the searches, there was testimony that he participated in the decision to exe-cute the search, detained the students in the classroom while threatening them with the possibility of a strip search, and ignored the protests of the students. Ms. Rodriguez ad-ministered a particularly humiliating search to Crystal, requiring not only that she strip nude, but that she urinate while Ms. Rodri-guez observed her. The fact that Ms. Rodri-guez was the secretary of Principal Warren, and was acting at his behest does not excuse her behavior. Counselor Perry's and Ms. Rodriguez' involvement in the 1989 search provides further evidence of a culpable men-tal state. We hold that there was sufficient evidence presented at trial to support the jury's conclusion that Counselor Perry and Ms. Rodriguez acted intentionally with "utter indifference" toward the rights of the stu-dents. We reverse the Court of Appeals' ruling with regard to Counselor Perry and

Ms. Rodriguez and reinstate the jury's awards of punitive damages against them.

## ATTORNEY'S FEES

{34} Finally, we address the Court of Appeals' reversal of the trial court's award of attorney's fees under Section 1988. The Court of Appeals held that in order to cal-culate attorney's fees under Section 1988, the district court was required to use the "lodestar" method of multiplying the hours Plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate. *See Kennedy*, 1998–NMCA–051, ¶ 66, 124 N.M. 764, 955 P.2d 693. The Court also held that the failure of Plaintiffs' counsel to supply the district court with records disallowed an adequate determination of a lodestar figure. We affirm.

{35} At least within the Tenth Circuit, Section 1988 attorney's fees must be calculated according to the lodestar method. *See United Phosphorus Ltd. v. Midland Fu-migant, Inc.*, 205 F.3d 1219, 1233 (10th Cir. 2000); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir.1998); *Jane L. v. Bangerter*, 61 F.3d 1505, 1509 (10th Cir. 1995); *see also Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The party seeking fees pursuant to Section 1988 has the burden of proving the number of hours spent on the case by means of "meticulous, contemporaneous time rec-ords that reveal, for each lawyer for whom fees are sought, all hours for which compen-sation is requested and how those hours were allotted to specific tasks." *United Phospho-rus*, 205 F.3d at 1233 (quoting *Case*, 157 F.3d at 1250). When a court is dissatisfied with the detail or contemporaneousness of such records, it may reduce fees accordingly. *Id.*

{36} In the present case, nei-ther of Plaintiffs' attorneys provided the trial court with any time sheet or other time record. The attorneys instead submitted separate affidavits asserting that they had worked approximately 400 and 600 hours re-spectively, but failing to specify how those hours had been spent. The Court of Appeals held that this lack of specificity prevented the defense from contesting Plaintiffs' attor-neys' claims and failed to provide the de-

tailed evidence required to support a lodestar calculation. We agree. We hold that a lodestar figure cannot fairly or properly be ascertained unless the prevailing attorney supplies at least some evidence detailing the number of hours spent engaged in specific activities relating to the preparation and litigation of a Section 1983 claim. We also note that where such records have not been kept contemporaneously with the lawsuit, the use of reconstructed time records will not bar a claim for Section 1988 attorney's fees. *See Carter v. Sedgwick County, Kan.*, 929 F.2d 1501, 1506 (10th Cir.1991).

{37} Plaintiffs urge that a federal statute, silent on the means of determining what fees are reasonable, does not preempt state law that describes such means without contradicting the federal statute or underlying policy. Such an assertion has limited applicability to the facts of this case. First, we have been unable to find any state law indicating a New Mexican proclivity toward awarding attorney's fees under Section 1988 in any way other than in keeping with the federal method. While it is true, as Plaintiffs suggest, that we did not require time records for attorney's fees in *Lucero v. Aladdin Beauty Colleges, Inc.*, 117 N.M. 269, 271, 871 P.2d 365, 367 (1994), those fees were awarded pursuant to our state's Human Rights Act, rather than federal statute, and, more importantly, were tabulated according to a method other than the federally mandated lodestar method. There exists no state law on Section 1988 attorney's fees that might, as Plaintiffs suggest, resist preemption. Second, while it is true that Section 1988 is silent as to the means of determining reasonable attorney's fees, the language of the statute itself does not exhaust the law on the matter. As observed above, various Tenth Circuit decisions clearly establish the proposition that at least some record of expended hours is required to recover attorney's fees. We see no reason to stray from these cases. We remand this case to the trial court for a more informed determination of attorney's fees.

## CONCLUSION

{38} The Court of Appeals' rulings on damages are reversed for the reasons set out herein. All jury awards for compensatory and punitive damages against Superintendent Derrick, Counselor Perry, Ms. Rodriguez, and Principal Warren are reinstated. The case is remanded for a hearing to determine attorney's fees, in which counsel for Plaintiffs must produce detailed time records.

{39} **IT IS SO ORDERED.**

MINZNER, C.J., BACA, SERNA, and MAES, JJ., concur.