MULQUEEN V. RADIOLOGY ASSOCIATES OF ALBUQUERQUE

This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**CATHERINE MULQUEEN, D.O.,**
**Plaintiff-Appellant,**
**v.**
**RADIOLOGY ASSOCIATES OF ALBUQUERQUE, P.A.;**
**JOSEF NISENBAUM, D.O.; BRIAN POTTS, M.D.;**
**KENT HOOTMAN, M.D.; DOUGLAS MEEK, M.D.;**
**CHRISTOPHER BAUMAN, M.D.; and**
**RENEE BUTLER-LEWIS, M.D.,**
**Defendants-Appellees.**

No. A-1-CA-35852

COURT OF APPEALS OF NEW MEXICO

February 4, 2019

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY, Carl J. Butkus, District Judge

**COUNSEL**

L. Helen Bennett, P.C., L. Helen Bennett, Albuquerque, NM, Sandoval Firm, Richard Sandoval, Santa Fe, NM, Valdez & White, Timothy White, Albuquerque, NM, for Plaintiff

Rodey, Dickason, Sloan, Akin & Robb, P.A., Jocelyn Drennan, Scott Gordon, Albuquerque, NM, for Defendants

**JUDGES**

JULIE J. VARGAS, Judge. **WE CONCUR:** M. MONICA ZAMORA, Chief Judge, MEGAN P. DUFFY, Judge

**AUTHOR:** JULIE J. VARGAS

**MEMORANDUM OPINION**

**VARGAS, Judge.**

**{1}** Plaintiff asks us to reverse the district court's order compelling arbitration. She argues that the claims stated in her complaint are: (1) outside the scope of the arbitration agreement, (2) that the Defendants failed to satisfy the agreement's conditions precedent and thus waived their right to compel arbitration, and (3) that individual Defendants who were not signatories to the agreement cannot compel arbitration of the claims against them. We conclude that Plaintiff's claims are within the scope of the arbitration agreement, that Defendants did not expressly waive arbitration, and that Plaintiff is estopped from preventing Defendants from compelling arbitration. We affirm the district court's order.

**BACKGROUND**

**{2}** Catherine T. Mulqueen (Plaintiff) left the employ of Radiology Associates of Albuquerque, P.A. (RAA) on January 1, 2014. After leaving RAA, Plaintiff filed suit against RAA and six of RAA's shareholders: Joseph Nisenbaum, D.O., Brian Potts, M.D., Kent Hootman, M.D., Douglas Meek, M.D., Christopher Bauman, M.D., and Renee Butler-Lewis, M.D. (collectively, Shareholder Defendants). Plaintiff's complaint asserts nine counts: "Count I. Tortious Interference with Contractual Relations Against the Individual Defendants"; "Count II. Oppressive Conduct [and] Breach of Fiduciary Duties by Individual Defendants"; "Count III. Fraud and Misrepresentation by All Defendants"; "Count IV. Breach of Contract, Express or Implied by RAA"; "Count V. Breach of the Implied Covenant of Good Faith and Fair Dealing by RAA"; "Count VI. Conspiracy Among Individual Defendants"; "Count VII. Prima Facie Tort Against All Defendants"; "Count VIII. Discrimination in Violation of the New Mexico Human Rights Act"; and "Count IX. Retaliation." Plaintiff brought Counts III, VII, VIII, and IX against RAA and the Shareholder Defendants (collectively, Defendants), Count I, Count II, and Count VI against Shareholder Defendants alone, and Count IV and Count V against RAA alone. In response, Defendants filed a motion to dismiss the complaint and compel arbitration or, alternatively, to stay the proceedings and compel arbitration. Following full briefing and a hearing on the motion, the district court granted Defendants' motion, ordered all of Plaintiff's claims to be arbitrated according to the alternative dispute resolution provision of the employment agreement Plaintiff signed with RAA, and stayed further proceedings pending arbitration.

**{3}** When Plaintiff joined RAA, she signed a contract entitled, "Physician Employment Agreement for Shareholders" (the Agreement). The Agreement contained a clause providing for arbitration:

> 7.2 **Alternate Dispute Resolution**: [RAA and Plaintiff] agree that any dispute arising from the employment relationship (including, but not limited to, claims arising under contract, common law, or Federal or State statutes and regulations) will first be subject to negotiation. The parties agree to discuss their dispute in an attempt at resolution. If resolution fails and an impasse is reached in negotiation,

the parties shall submit the dispute to mediation at the request of either party. A request should be submitted by either party promptly.

A mediator located in New Mexico should be selected within fourteen (14) days of the parties' request and a mediation session should be scheduled in Albuquerque, New Mexico within fourteen (14) days of the selection of the mediator. Mediators shall be selected upon agreement of the parties from any list maintained by the American Arbitration Association or the U.S. District Court for the District of New Mexico or the National Health Lawyers Association, or the parties may agree upon any other person as a mediator.

If the mediation process fails, the dispute shall be submitted to binding arbitration. Within fourteen (14) days of the conclusion of the mediation session, parties may select one arbitrator by agreement or each party shall select one arbitrator who will choose a third. The arbitrator or arbitrators shall hear the dispute and determine their decision by a majority vote. The arbitration shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

The parties may cooperatively extend the time frame limitations in the preceding paragraphs. The parties agree to share the cost of any mediation and arbitration by each paying one-half of the total cost. The parties will pay their own attorney[] fees if any.

The only signatories to the Agreement are Plaintiff and Defendant Potts, who signed the Agreement on behalf of RAA in his capacity as president.

## DISCUSSION

**{4}** Plaintiff appeals the district court's order compelling arbitration, arguing that the claims stated in her complaint were not within the scope of the arbitration agreement; that the arbitration agreement was not enforceable because the conditions precedent stated therein were not satisfied; Defendants, therefore, waived any right to enforce the agreement; and that as non-signatories to the arbitration agreement, the Shareholder Defendants could not enforce the Agreement. We address each argument in turn.

## I.    Scope of Arbitration

**{5}** We begin with the question of whether the allegations set forth in Plaintiff's complaint fall within the scope of the Agreement. *See* NMSA 1978, Section 44-7A-7(b) (2001) (requiring the court to determine "whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate"). As a preliminary matter, we note that Plaintiff does not challenge the validity of the Agreement or the arbitration clause therein; nor does she challenge the district court's determination that the arbitration clause is valid. *See* Rule 12-318(A)(4) NMRA (requiring that brief in chief "shall set forth a specific attack on any finding, or the finding shall be deemed conclusive"); *Flemma v.*

*Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 28, 303 P.3d 814 (stating that "[w]hether a valid contract to arbitrate exists is a question of state contract law" and that a legally valid contract must be "supported by an offer, . . . acceptance, consideration, and mutual assent" (internal quotation marks and citations omitted)). Instead, Plaintiff claims that the "shareholder and tort claims" in her complaint are outside the scope of the Agreement and "are not based on the terms or conditions of [her] employment agreement with RAA," but rather on RAA's bylaws and articles of incorporation. "We review the applicability and construction of a contractual provision requiring arbitration de novo." *Piano v. Premier Distrib. Co.*, 2005-NMCA-018, ¶ 4, 137 N.M. 57, 107 P.3d 11; *see Flemma*, 2013-NMSC-022, ¶ 28, ("Whether a valid contract to arbitrate exists is a question of state contract law."); *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 27, 150 N.M. 398, 259 P.3d 803 (acknowledging that "[c]ontract interpretation is a matter of law that [appellate courts] review de novo").

**{6}** The allegations set forth in Plaintiff's complaint describe RAA's recruitment of Plaintiff, its promise to assign a certain percentage of work in a "Woman's Imaging" center to her, and its promise to consider her for a director position within that specialty.[1] Plaintiff's complaint also alleges that after she was hired but before she began work with RAA, RAA hired another radiologist, and "not long" after being hired, he was appointed director of Women's Imaging. After both radiologists were working as employees of RAA, RAA created a new type of "on call" shift that only the newly-hired radiologist and RAA president, Defendant Potts, were permitted to work. Over time, and allegedly as a result of Plaintiff's pursuits regarding assignment to the newly-created shift, her working relationship with coworkers and fellow shareholders deteriorated to the point that she eventually resigned. Plaintiff's complaint ultimately centers on the effects of hiring decisions and practices of RAA and certain Shareholder Defendants, her unrealized employment expectations with regard to specialization and promotion, and the allocation of work shifts—particularly the inequitable allocation of privileges.

**{7}** In New Mexico, there exists "a strong public policy to enforce agreements to arbitrate," and courts adhere to the concept that "[w]hen a party agrees to a non-judicial forum for dispute resolution, the party should be held to that agreement." *Lisanti v. Alamo Title Ins. of Texas*, 2002-NMSC-032, ¶ 17, 132 N.M. 750, 55 P.3d 962. We look to the plain meaning of the terms in the contract to define the scope of the matters to be arbitrated. *Santa Fe Technologies, Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 52, 131 N.M. 772, 42 P.3d 1221 (summarizing the court's inquiry as a determination of "whether the parties have agreed to arbitrate the matter under dispute"). "When the parties employ broad arbitration clauses, the subject matter of the underlying agreement determines the scope of the arbitration provision." *Id.* ¶ 56. "Once it appears that there is, or is not a reasonable relationship between the subject matter of the dispute and the general subject matter of the underlying contract, the court's inquiry is ended." *K.L. House Constr. Co. v. City of Albuquerque*, 1978-NMSC-025, ¶ 7, 91 N.M. 492, 576 P.2d 752.

**{8}** The Agreement makes "any dispute arising from the employment relationship" subject to the arbitration clause. We therefore look to the allegations and claims set

forth in Plaintiff's complaint to determine whether they have a reasonable relationship to her "employment relationship" with RAA. *See id.* Initially, we note that Plaintiff argues that she "did not allege employment-related claims against the [Shareholder] Defendants, but tortious acts," which we understand as her attempt to distinguish between claims arising out of the breach of the Agreement and claims based on RAA's alleged tortious conduct. That particular distinction is not persuasive; however, because the relevant inquiry is whether the alleged tortious acts also arose from Plaintiff's employment relationship with RAA. *See Santa Fe Technologies, Inc.*, 2002-NMCA-030, ¶ 56 (evaluating the connection between the subject matter of the contract and the subject matter of the dispute to determine whether the dispute falls within the scope of an arbitration clause).

**{9}**     The language of the allegations in Plaintiff's complaint demonstrate that each allegation, whether arising out of an alleged breach of the Agreement or whether sounding in tort, is the result of a dispute arising from her employment relationship with RAA. Count I (tortious interference with contractual relations), Count IV (breach of contract), and Count V (breach of the duty of good faith and fair dealing) are based expressly on Plaintiff's employment contract with RAA. Further, Count II (breach of fiduciary duties), Count III (fraud and misrepresentation), Count VI (conspiracy), and Count VIII (discrimination) are based on her ownership and employment position at RAA; Count VII (prima facie tort) is similarly unpersuasive, as Plaintiff claims it "aris[es] out of her position as a co-equal shareholder;" however, she became a shareholder solely by virtue of her employment with RAA. Finally, Count IX (retaliation) challenges her constructive discharge from RAA, which arises from her employment relationship.

**{10}**     "When a reasonable relationship between the subject matter of the dispute and the underlying agreement exists, the dispute is within the arbitration provision and should be arbitrated." *Santa Fe Technologies, Inc.*, 2002-NMCA-030, ¶ 52. We, therefore, conclude that the allegations in Plaintiff's complaint comprise a dispute arising from Plaintiff's employment relationship with RAA. All claims raised in the complaint, therefore fall within the scope of matters contemplated by the arbitration clause of the Agreement.

**{11}**     We pause here to acknowledge Plaintiff's assertion that rather than arising from the Agreement, her claims are founded upon violations of RAA's bylaws and articles of incorporation, which "govern the equal relationship and obligations among the officers, shareholders, and directors of RAA." She also points out that the bylaws "set forth the rights and duties of directors and officers of RAA in the management of RAA, the rights and obligations of shareholders to purchase, hold, and transfer shares, to vote, and to act on behalf of RAA[,]" yet they contain no agreement to arbitrate disputes among shareholders. This distinction is unpersuasive, as nothing in the Agreement exempts shareholder disputes from the application of the arbitration clause. Instead, the Agreement, which by its own terms applies to the employment of shareholders, broadly incorporates *any* dispute arising from an employment relationship. Plaintiff's allegations undoubtedly arise from her employment relationship with RAA, and nothing in the plain

language of the Agreement removes shareholder disputes arising from that relationship from the scope of the arbitration clause.

## II.        Waiver and Conditions Precedent

**{12}**    Plaintiff argues that "Defendants waived any claim to arbitration by failing to satisfy the conditions precedent to invocation of the arbitration clause[,]" namely, negotiation and mediation. To waive their right to arbitrate, Defendants must have engaged in "an intentional relinquishment of the right to arbitrate[,]" which can be inferred from actions taken that are inconsistent with the right to demand arbitration. *United Nuclear Corp. v. Gen. Atomic Co.*, 1979-NMSC-036, ¶ 36, 93 N.M. 105, 597 P.2d 290. In this case, there was no objective manifestation of intent upon which Plaintiff can reasonably rely in making her waiver argument. Rather, the record demonstrates that Defendants consistently and repeatedly sought to invoke the arbitration clause of the Agreement, which requires an increasingly formal dispute resolution framework, first requiring the parties to negotiate, then mediate, and only if those two requirements are unsuccessful, arbitrate.

**{13}**    Following what it characterized as "counseling sessions" with Plaintiff that were aimed at negotiation, RAA wrote a letter reminding Plaintiff of her obligation under the Agreement to negotiate disputes arising from her employment relationship and expressing its willingness to "negotiate all disputes relating to [Plaintiff's] employment with her and a neutral third party." Plaintiff responded with a list of concerns, one of which was the manner in which interactions occurred between herself and the RAA representatives, to which RAA responded by again expressing its willingness "to discuss all disputes with a neutral third party facilitator and/or mediate all disputes" and stating that if Plaintiff would "indicate [her] desire for a facilitation or mediation, RAA [would] approve the name of a facilitator or mediator." In response, Plaintiff stated, "[R]ather than forcing everyone to incur costs for a separate facilitation/mediation, I'll defer to the EEOC." The record is unclear as to whether Plaintiff was referring to some sort of EEOC mediation process, whether she was indicating her desire to proceed with her EEOC complaint, or something else. Defendants, however, interpreted Plaintiff's statement as a rejection of mediation and consequently stated its desire to submit the dispute to arbitration according to the Agreement. Plaintiff answered by stating that she had not refused mediation, asserting that RAA failed to negotiate as required by the Agreement, and requesting "that RAA participate in a discussion aimed at resolution[,]" pursuant to the Agreement. RAA disagreed with Plaintiff's characterization of its actions and stated as much in a letter to Plaintiff:

> RAA believes that it has attempted to negotiate, and made a request for mediation[,] which [Plaintiff] rejected. RAA hereby repeats its demand for arbitration. [Enclosed are] the resumes of two individuals who would be acceptable arbitrators. Please provide names of individuals acceptable to [Plaintiff]. [RAA] look[s] forward to scheduling arbitration shortly."

After receiving no response, three weeks later, RAA again wrote to Plaintiff prompting her to identify an appropriate arbitrator and stating that if she failed to do so, "RAA [would] proceed with arbitration on its own."

**{14}** Plaintiff responded to RAA by letter, in which she alleged that RAA never responded to her request that the parties engage in "a discussion aimed at resolution," asserted that RAA "categorically refuse[d] to participate in . . . mediation" Plaintiff arranged with the Human Rights Bureau, and accused RAA of "bullying" Plaintiff by submitting a demand for premature arbitration. Plaintiff's letter sought RAA's response to four issues:

> 1.      Whether RAA will have an informal discussion with [Plaintiff] and, if so, a proposal for dates/times;
>
> 2.      Why RAA refuses to mediate before the Human Rights Bureau and, given RAA's position that [Plaintiff] "refused" mediation where it is documented that RAA proposed an alternate mediator;
>
> 3.      [Plaintiff's] foregoing request for case law citations indicating that RAA may unilaterally ignore the pre-arbitration requirements under the contract; and
>
> 4.      [Plaintiff's] foregoing request for clear articulation of the issues . . . RAA believe[s] have been addressed [through] the pre-arbitration requirements so, in the event the parties proceed to arbitration, [Plaintiff] may propose an arbitrator who is savvy as to those exact issues.

Shortly thereafter, Plaintiff resigned from RAA. In an email acknowledging receipt of her resignation, RAA stated, "RAA understands that your resignation withdraw[s] your lawyer's request for mediation stated in her letter." Plaintiff's attorney responded by seeking a response to the four matters stated in her last letter, to which RAA responded, "Don't you think this is sort of a moot issue now that she has resigned?" Plaintiff responded by stating that "[s]ince RAA has abandoned its demand for arbitration now that [Plaintiff] is leaving, [she] does not see a reason to mediate."

**{15}** Despite Plaintiff's characterization of RAA's final inquiry as an abandonment of a right, RAA's correspondence leading up to litigation is far from that which demonstrates an intentional relinquishment of its right to arbitrate. RAA made two attempts to mediate, three attempts to arbitrate, and two attempts to clarify the status of its arbitration request after Plaintiff's resignation. RAA's actions do not indicate an intent to abandon a right to arbitrate, and do not amount to an objective manifestation of intent to waive the right to arbitrate upon which Plaintiff could rely. *See United Nuclear Corp.*, 1979-NMSC-036, ¶ 36.

**{16}** Plaintiff also argues that the time deadlines to conduct mediation and instigate arbitration were "necessary conditions precedent to invocation of mandatory arbitration" under the Agreement, and that by failing to meet those deadlines, Defendants lost the

ability to enforce the arbitration clause. It is for the arbitrator, not the court, to decide "whether a condition precedent to arbitrability has been fulfilled and whether a contract containing a valid agreement to arbitrate is enforceable." Section 44-7A-7(c).

### III. Shareholder Defendants' Right to Enforce the Arbitration Agreement

**{17}** Finally, we address Plaintiff's assertion that Shareholder Defendants, as non-signatories to the Agreement, cannot compel arbitration based on the arbitration clause. Generally, a non-signatory to an arbitration agreement cannot compel arbitration. *Horanburg v. Felter*, 2004-NMCA-121, ¶ 16, 136 N.M. 435, 99 P.3d 685. However, exceptions to this general rule arise from the doctrine of equitable estoppel in two circumstances: "(1) when a signatory to the agreement must rely on the terms of the agreement in making a claim against a non-signatory; or (2) when a signatory alleges substantial interdependence and concerted misconduct by both another signatory and a non-signatory, making arbitration between signatories meaningless." *Id.* ¶ 17; *see Frederick v. Sun 1031, LLC*, 2012-NMCA-118, ¶ 30, 293 P.3d 934 (suggesting that allegations of substantial interdependence and concerted misconduct exist where plaintiff alleges a conspiratorial relationship between the signatory and non-signatory, such that claims "are based on the same facts and are inherently inseparable" (internal quotation marks and citation omitted)); *Murken v. Suncor Energy, Inc.*, 2005-NMCA-102, ¶ 12, 138 N.M. 179, 117 P.3d 985 ("Courts that apply the doctrine of equitable estoppel do so to avoid rendering meaningless the purpose of the signatories' agreement, an arbitration, in the absence of a non-signatory." (internal quotation marks and citation omitted)).

**{18}** While we have previously considered the applicability of the doctrine generally, we found factual distinctions that precluded equitable estoppel as a means of allowing a non-signatory to an arbitration agreement to compel arbitration. *See Frederick*, 2012-NMCA-118, ¶ 29 (considering both equitable estoppel factors, but concluding it does not apply because plaintiff's claims were not derived from or intertwined with the agreement containing the arbitration clause); *Murken*, 2005-NMCA-102, ¶ 12 (acknowledging doctrine and discussing distinctions in its application, but concluding that "even if New Mexico recognized the doctrine . . . its application would not be appropriate in this case"); *Horanburg*, 2004-NMCA-121, ¶ 18 (declining to apply equitable estoppel because the facts of the case did not support the application of either exception). Nonetheless, we have previously used the doctrine of equitable estoppel in an analogous circumstance to require non-signatories to arbitrate, contrary to their wishes, when the non-signatories sought to reap the benefits of the agreement containing an arbitration clause. *Damon v. StrucSure Home Warranty, LLC*, 2014-NMCA-116, ¶ 1, 338 P.3d 123 (holding that "a nonparty who directly seeks the benefits of a warranty agreement is equitably estopped from refusing to comply with a reasonable arbitration provision contained in the same agreement"). In this instance, the non-signatories ask us to require the signatory to arbitrate with them. We note that estoppel is "most usual in situations where the non-signatory is seeking to compel arbitration against the signatory[,]" as is the case here. *Murken*, 2005-NMCA-102, ¶ 10 (internal quotation marks and citation omitted). Plaintiff signed the Agreement, agreeing to arbitrate any

disputes that arose from her employment relationship with RAA, but now seeks to avoid arbitrating many of her claims by raising those claims against the Shareholder Defendants, rather than against RAA itself. Having adopted the doctrine of equitable estoppel in the arbitration context in *Damon*, we apply it here, where the non-signatory is seeking to bind the signatory to the Agreement.

**{19}**   Unlike previous cases considering whether a non-signatory can compel a signatory to arbitrate using equitable estoppel, the facts of this case satisfy both of the factors articulated in *Horanburg*. First, Plaintiff undoubtedly relies on the existence and terms of her employment contract with RAA to bring Count I against the Shareholder Defendants, alleging that RAA breached its agreement with her and the Shareholder Defendants caused RAA to breach its agreement. She also implicates the Agreement in Count II and Count III, basing those claims on representations RAA made to her in its "offer of shareholder" and "offer of employment[,]" which culminated with the execution of the Agreement.

**{20}**   Second, Plaintiff's complaint is replete with factually intertwined allegations that the signatory, RAA, and non-signatories, the Shareholder Defendants engaged in misconduct. *See Frederick*, 2012-NMCA-118, ¶ 30 (noting that the exception generally required allegations of "substantial and concerted misconduct by another signatory and non-signatory" and recognizing a case in which signatory and non-signatory "improperly cooperated, conspired[,] and otherwise colluded" as an example of an allegation of interdependent and concerted misconduct (internal quotation marks and citation omitted)). The complaint makes repeated allegations that Shareholder Defendants acted in concert or conspired to harm Plaintiff. Plaintiff alleges that she was harmed by "conspiratorial acts and/or omissions by all individual Defendants," that "[a]ll individual Defendants conspired to harm [Plaintiff's] interests in RAA and her employment therewith[,]" that the "individual Defendants . . . engaged in conduct to squeeze [Plaintiff] out of her ownership and employment position at RAA[,]" and that the "individual Defendants . . . prevent[ed] her from acquiring or continuing a prospective relation with RAA." Based on the allegations set forth in Plaintiff's complaint, we conclude that the facts giving rise to her claims against the Shareholder Defendants are so intertwined and interdependent with her claims against RAA that they are inherently inseparable. *See Frederick*, 2012-NMCA-118. ¶ 29; *Murken*, 2005-NMCA-102, ¶ 10 (noting that federal courts "have been willing to estop a signatory from avoiding arbitration with a non[-]signatory when the issues the non[-]signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." (emphasis, internal quotation marks, and citation omitted)).

**{21}**   Plaintiff's claims against the Shareholder Defendants are based on actions they took on behalf of RAA and in their capacities as RAA president, executive committee, board members, and shareholders.[2] To allow Plaintiff to effectively avoid the arbitration provision by naming the individual RAA shareholders as defendants undermines our statewide policy favoring arbitration and renders meaningless the purpose of the arbitration clause in the Agreement. We therefore conclude the Shareholder Defendants may enforce the Agreement's arbitration clause.

**{22}**   To the extent Plaintiff may have intended to argue that she sought to sue Shareholder Defendants in their individual capacities, rather in their capacity as RAA shareholders, she has failed to adequately develop that argument or cite to relevant authority to support it. This Court does not review unclear or undeveloped arguments. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076.

**CONCLUSION**

**{23}**   We affirm the district court.

**{24}**   **IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**MEGAN P. DUFFY, Judge**

---

1Nothing in the Agreement sets forth any stipulations as to the percentage of specialty work to which Plaintiff was entitled, any guarantee that she would receive the director position, or any timeline during which she could or should expect to be considered for the director position. Instead, the Agreement provides that Plaintiff "will provide the equivalent of full time General Radiology Department call (sharing equal call with other general diagnostic radiologists)" and "shall be required to provide call coverage as shall be determined from time to time by the Board of Directors of the Employer."

2Though the record does not contain a comprehensive list of the individuals who served in these roles, it appears from Plaintiff's complaint that many of the Shareholder Defendants served in other capacities of RAA's governing boards and administration.